Thomas G. Waller
Alaska Bar No. 0109052
BAUER MOYNIHAN & JOHNSON LLP
2101 4TH Avenue - 24th Floor
Seattle, WA  98121
(206) 443-3400

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT ANCHORAGE

JOSEPH ABRUSKA,

                    Plaintiff,

          v.

NORTHLAND VESSEL LEASING
COMPANY, LLC and NAKNEK
BARGE LINES, LLC; NORTHLAND          CASE NO. A04-209 CV (JKS)
SERVICES, INC.,

                    Defendants.

DEFENDANTS' JOINT MOTION FOR SUMMARY JUGMENT

          Defendants move to dismiss all claims brought against them by plaintiff.  In his complaint, plaintiff makes two narrow allegations of injury-causing negligence against defendants: (1) that a third perimeter barge wire should have been affixed aboard the barge BARANOF TRADER; and, (2) that one of the two existing perimeter wires was too loose.  Given the undisputed relevant facts, plaintiff's allegations against defendants are insufficient to create liability under § 905(b) of the Longshore Act.

I.          FACTS

          A.          Accident

          The following is the verbatim statement of the Court's *Factual and Procedural Background* from its Order filed on June 7, 2005.  *Docket 11.*

                    [Plaintiff Joseph Abruska] was employed by Northland Services, Inc.
                    Northland Leasing owned the BARANOF TRADER, and Naknek was the
                    owner *pro hac vice* of the barge.  *Id.*  On August 24, 2003, Abruska was

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

1
2
3
4
5
6

employed to unload the BARANOF TRADER.  *Id.,* Ex. 1 at 1-2, 6.  He alleges that while he was "engaged in shackling operations," he slipped and fell "between the two cables running the circumference of the BARANOF TRADER."  *Id.,* Ex. 1 at 7.  He caught himself on the lower cable, but when the barge moved back against the dock, Abruska was "crushed" between the dock and brought suit in federal court, alleging that Northland Leasing and Nakek [Barge Lines] were negligent "in using and furnishing unsafe and improper railings."  *Id.,* Ex. A at 8.  The Court has jurisdiction.  *See* 28 U.S.C. § 1331(1).

7
8
9
10

Since entry of the Order last June, plaintiff Abruska has added his employer (Northland Services, Inc.) as a party defendant.  His allegations of negligence against Northland Services are identical to his allegations against Naknek and Northland Vessel Leasing.  *Amended Complaint, para. 24.*

11

Additional, undisputed facts include the following:

12
13
14
15
16
17

- When the BARANOF TRADER first arrived in Naknek sixteen or eighteen hours before the incident, supervisors of Northland Services (Abruska's employer) performed a routine walk-around inspection of the barge before starting cargo operations; a loose wire was identified -- and tightened -- on the side of the barge *opposite* where Abruska later was injured; if there was a loose wire near where Abruska fell, it was not identified as loose by Northland Services;  *Ex. 1*; *Deposition of Bill Emory*, p. 56;

18
19
20
21

- Abruska was hired by his cousin -- Northland Services Operations Bill Emory -- at approximately 2:00 a.m. on the very morning of his accident; *Ex. 2, Deposition of Joseph Abruska*, p. 148, 162-163 ("*[T]hey asked if I wanted to make an extra five bucks, work on the barge for the night.*"); *Ex. 1,* p. 43 *("Two to three hours before the fall.")*

22
23
24
25
26

- Before starting work as a lasher with Northland Services, Abruska had never before worked as a longshoreman and had no experience working on barges (whether as lasher or otherwise).  *Ex. 2,* p. 150: ("Had you ever work[ed] on the barge before?"  *No.*  "Or any barge?"  *No.  That was the first time.*)

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

- After he was hired by Northland Services to work on the barge, Abruska was given a brief orientation on the barge, but received no safety training, did not receive a safety handbook and filled out no paperwork. *Ex. 2,* p. 149; 162-163 ("Did Mr. Emory come up on the barge with you?" *Yes. He -- we went down the barge together. . . . He just had everybody come over, had the introductions, and showed -- showed me what we were doing on the barge. Ex. 1, p. 42 ("I walked Joseph down on the barge, told him what we wanted him to do, lashing containers, stick together and be careful.")*

- The area where Abruska was working was unlit; there were no lights on the barge and the nearest shore light was "half the length of the dock away;" Northland Services did not give Abruska a flashlight*; Ex. 2,* p. 154-155 ("I didn't have a light in my vicinity");

- When Abruska's accident occurred, Northland Services Operations Manager Bill Emory was above, on the dock and barge master/assistant operations manager Luke Donkersloot was operating a forklift, moving containers aboard the barge; *Ex. 2,* p. 171 ("*Bill Emory came down onto the barge and found me"; Ex. 3, Deposition of Luke Donkersloot, p. 15, 29 ("Bill [Emory] called on the radio, said all stop [.] I parked the machine [forklift], he said where's Joe [?] . . . Bill came down to the barge and we both went around the barge to look for him and Bill found him sitting on the I-beam underneath the dock.");*

- Even after Abruska's accident, Northland's Operations Manager Bill Emory did not consider the wire sufficiently loose to require warnings or repair; *Ex. 1, p. 59* ("[You] just got them going again?" *Yes.)*

B.    Benefits Under the Longshore Act.

As a result of his injuries, Abruska has received full Longshore Act benefits under Northland Services' longshore insuring program. His Longshore Act claim has included longshore compensation benefits and full medical care. *Ex. 4*, Plaintiff's Supplemental Disclosures (Dated 12/21/05). With medical care continuing, final award has not been made yet.

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

C.    Defendants

Abruska has sued three defendants under 33 USC sec. 905(b): Northland Vessel Leasing Company, LLC; Naknek Barge Lines, LLC; and, most recently, Northland Services, Inc.

Northland Vessel Leasing, Inc.[1] was at all times material solely a vessel holding company. It owned the barge BARANOF TRADER, but had no offices, no staff, no employees and no involvement in the operations of its vessels.  Its sole function was to hold title to vessels for demise (bareboat) charter to third parties.  *Decl. of Barry Hachler.*

Naknek Barge Lines was at all times relevant bareboat charterer (owner *pro hac vice*) of the BARANOF TRADER.  As bareboat charterer, Naknek Barge Lines operated the towing vessel that towed the barge -- and as such, had exclusive navigational control over the barge at sea -- but it had no offices or other personnel based in Alaska.  *Decl. of Ed Hiersche.*

Northland Services was at all material times a transportation and stevedoring company. Northland Services time-chartered the barge BARANOF TRADER from Naknek Barges Lines. Under the Time Charter, Nakenk Barge Lines had exclusive navigation and control of the BARANOF TRADER (with its tugs and crew) between destinations identified by Northland Services.  *Declaration of Barry Hachler.*  Personnel employed by Northland Services at its corporate shipping offices in Seattle were responsible for the barge's scheduling, ports of call and cargo booking.  Those employees were not involved in the loading, unloading or lashing of cargoes in Naknek.  *Id.*  Northland Services also operated as a stevedore/longshore employer in August 2003, with its longshoremen loading and unloading the BARANOF TRADER when it arrived and departed Naknek.  The Northland barge supervisors and longshoremen were employed solely to load and unload the barges.  *Id.*  They did not take any part in and had no responsibility for the booking or destinations of cargoes.  *Id.*

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

---

[1]  Plaintiff identified the entity as an LLC in its Complaint and, in its Answer, Northland Vessel Leasing admitted it was an LLC "at all material times."  The entity was, in fact, registered as an LLC in October 2004 (when the Answer) was filed, but was a *corporation* when the incident occurred in August 2003.  *Decl. of B. Hachler.*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 4 of 30 -

D.    Plaintiff's Allegations Against Defendants

Abruska makes two narrow allegations against all three of the named defendants:

(1)    defendants failed to provide a third perimeter wire aboard the BARANOF TRADER, in violation of Coast Guard regulations allegedly applicable. A*mended Complaint, ¶¶ 16-17.*[2]

(2)    the cables in the area of plaintiff's accident were loose and/or negligently maintained. *Amended Complaint, ¶18.*

II.    DISCUSSION

A.    Summary judgment standard

A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*; *T.W. Electrical Service, Inc. v. Pacifica Electrical Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). In considering a motion for summary judgment, material facts and all inferences must be viewed in the light most favorable to the nonmoving party. *Id.* at 631. However, such inferences must be rational or reasonable and otherwise permissible under the governing substantive law. *Id.*

The moving party bears the initial burden of showing an absence of material fact, although this duty may be discharged by merely "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges this duty, the nonmoving party must not rest upon mere allegations or denials but must set forth specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

---

[2]  The Court earlier denied plaintiff's summary judgment motion regarding the alleged three-wire requirement. Docket No. 11.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 5 of 30 -

L.Ed.2d 202 (1986). If the evidence is merely colorable or not significantly probative, summary

judgment may be granted. *Anderson*, 477 U.S. at 248.

    B.    <u>§ 905(b) actions against vessel owners</u>

    33 U.S.C. § 905(b) and federal-case law interpreting the statute govern plaintiff's claims

against the defendants. *See, generally, Cowsert v. Crowley Maritime Corp.*, 101 Wn.2d 402, 680

P.2d 46 (1985) (applying federal maritime law under § 905(b) to longshoreman's action against a

vessel owner brought in state court). Section 905(b) provides:

> In the event of injury to a person covered under this chapter caused by the
> negligence of a vessel, then such person, or anyone otherwise entitled to recover
> damages by reason thereof, may bring an action against such vessel as a third party
> [.] . . . The liability of the vessel under this subsection shall not be based upon the
> warranty of seaworthiness or a breach thereof [.] The remedy provided in this
> subsection shall be exclusive of all other remedies against the vessel except
> remedies available under this chapter.

33 U.S.C. § 905(b). Under § 905(b), an injured longshore worker may recover against a vessel

owner only for the vessel owner's negligence. An injured longshoreman may not recover against

the vessel owner for the negligence of his stevedore-employer. *Id.*

    The fact that a stevedore-employer (e.g., Northland Services) also owns, operates or

charters a vessel does not change the rights of a claimant under § 905(b). *See Gravatt v. City of

New York*, 226 F.3d 108, 120 (2nd Cir. 2000) ("Insofar as the employer-vessel is negligent in its

*stevedore-employer capacity*, it is immune from suit under § 905(a). However, insofar as it [the

employer] is negligent in its *vessel capacity*, it will be liable under section § 905(b) in the same

manner as a third party[]").

    Thus, in order to recover under § 905(b), Abruska must produce evidence that Northland

Vessel Leasing, Naknek Barge Lines or Northland Services, Inc. were responsible as *vessel owner*

-- and *not as employer* -- for his injuries. <u>*Abruska cannot recover if the only evidence of*</u>

<u>*negligence arises from Northland Services' capacity as stevedore employer*</u>.

    In applying § 905(b), the Ninth Circuit cautions "[i]t is the exceptional case, under [the

U.S. Supreme Court's ruling in] *Scindia*, in which the shipowner remains liable as a 'deep pocket'

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

defendant when it turns the vessel over to the stevedore[.]"  *Bandeen v. United Carriers (Panama), Inc.*, 712 F.2d 1336, 1339 (9th Cir. 1983)(citing *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 164, 101 S. Ct. 1614, 68 L. Ed. 2d 1 (1981))

### *1.    History of the LHWCA*

In 1927, the U.S. Congress enacted the Longshore and Harbor Workers' Compensation Act.  The LHWCA is codified at 33 U.S.C. § 901 *et seq.* and creates a federal system of no-fault compensation of medical, disability and survivor benefits for work-related injuries and death to longshoremen, harbor workers and their estates.  The employees covered under the Act include "any longshoreman or other person engaged in longshoring operations, and any harborworker, including a ship repairman, shipbuilder, and shipbreaker."  33 U.S.C. § 902(3).

Under 33 U.S.C. § 905(a), an *employer's* liability is "exclusive and in place of all other liability of such employer to the employee [.]"  *See also*, H.R. Rep. No. 92-1441, at 1, *reprinted in* 1972 U.S.C.C.A.N. 4698, 4704 (1972):

> It is important to note that adequate [longshore] benefits are not only essential to meeting the needs of the injured employee and his family, but, by assuring that the *employers* bear the cost of unsafe conditions, serves to strengthen the *employer's incentive to provide the fullest measure of on-the-job safety.*") (emphasis)

S. Rep. No. 92-1125, at 2 (1972) ("It is important to note that adequate workman's compensation benefits…assur[e] that the *employer* bears the costs of unsafe conditions [and] serve to strengthen the employer's incentive to provide the fullest measure of on-the-job safety.  This consideration is particularly crucial with respect to *high-risk occupations* such as those covered by this Act.") (emphasis).

Until 1972, longshore workers injured aboard marine vessels were entitled to sue vessel owners under two distinct liability theories: "unseaworthiness" and negligence.  *Scindia Steam Navigation Co. v. De Los Santos*, *supra.*  Unseaworthiness was established by showing that some condition or appurtenance on board the vessel at the time of the accident was unreasonably

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

hazardous. *Seas Shipping Co. v. Sieracki*, 328 US. 85, 94, 66 S. Ct. 872, 90 L. Ed. 1099 (1946). Unseaworthiness is essentially a no-fault or strict liability cause of action. The vessel owner faced liability even if the stevedore-employer created the condition that caused the injury, making the vessel owner the virtual insurer of the on-board safety of the longshoremen. *See Scindia*, 451 U.S. at 164. To relieve the vessel owner of the harsh results of this strict liability, courts allowed a non-negligent vessel owner to pursue indemnification against the stevedore-employer in some instances. *Id.* Negligence was determined under general maritime law. *See Federal Marine Terminals v. Burnside Shipping Co*, 394 U.S. 404, 415, 89 S. Ct. 1144, 22 L. Ed. 371 (1969).

In 1972, Congress amended the LHWCA, radically changing the nature of longshore workers' actions against vessel owners. *Scindia*, 451 U.S. at 165. The Supreme Court in *Scindia* focused on the purpose of the changes:

> The 1972 Amendments, particularly by adding § 905(b), radically changed the scheme of things. The compensation payments due the longshoreman from the stevedore for injuries incurred in the course of his employment were substantially increased; the longshoreman's right to recover for unseaworthiness was abolished; his right to recover from the shipowner for negligence was preserved in § 905(b), which provided a statutory negligence action against the ship; and the stevedore's obligation to indemnify the shipowner if the latter was held liable to the longshoreman was abolished.

*Scindia*, 451 U.S. at 164-165.

The changes made by Congress in 1972 were designed "to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 96-97, 114 S. Ct. 2057, 2063, 129 L. Ed. 2d 78 (1994)("[S]ubjecting vessels to suit for injuries that could be anticipated and prevented by a competent stevedore would threaten to upset the balance Congress was careful to strike in enacting the 1972 Amendments."); *Carpenter v. Universal Star Shipping*, 924 F.2d 1539, 1543 (9th Cir. 1998) ("[I]f section 905(b) is read to impose liability on an owner for negligence that is in the first instance the stevedore's, [the LHWCA] will put all costs on the party who is least able to avoid the accident, the vessel. More importantly, [the LHWCA] will completely eliminate the

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

incentive to act with caution by the party who is in the best position to avoid the accident, the stevedore."); *Bandeen v. United Carriers (Panama), Inc.*, 712 F.2d 1336, 1339 (9th Cir. 1983) ("The stevedore is hired for its expertise in the handling of cargo safely, and the basic policy decisions of safety . . . must be entrusted to the stevedore company.")  The legislative history of the 1972 Amendments confirmed this purpose:  "*a vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore*."  H.R. Rep. No. 92-1441, at 7, *reprinted in* 1972 U.S.C.C.A.N. 4698, 4704.

  While the 1972 Amendments limited claims against vessel owners to negligence actions, Congress did not define what omissions and acts would constitute negligence.  *Howlett*, 512 U.S. at 97.  Congress left it to the courts to determine the duties owed and the contours of those duties.  *Id.*

### 2. *Duties of the Vessel Owner*

  In response to the Congressional mandate, the Supreme Court in *Scindia* stated that a vessel owner owes a duty of "due care under the circumstances."  *Scindia*, 451 U.S. at 167.  A vessel owner owes no other duty or duties to the longshore worker under § 905(b).  *Quevedo v. Trans-Pacific Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998) ("The Supreme Court has explicitly limited the duties imposed by § 905(b) on vessel owners.").

  "Due care" under *Scindia* is not a general negligence standard because the general duty is further divided into a narrow set of sub-duties.  *Howlett*, 512 U.S. at 98 (holding that *Scindia* "outlined the three general duties shipowners owe to longshoremen.");[3]  *Woods v. Sammisa*, 873 F.2d 842, 847 (5th Cir. 1989) ("The [*Scindia*] Court identified three aspects of this limited duty, only two of which are relevant here"); *Quevedo,* 143 F.3d at 1258 ( "It is now accepted that shipowners owe three narrow duties to longshoremen. . . .").  Vessel owners owe a turnover duty,

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

---

[3] The generally accepted practice is to refer to the *Scindia* duties as three, but a number of different articulations of the same duties can be made.  For example, the turnover duty includes the duty of safe condition and the duty to warn and can be referred to as two turnover duties or as two aspects of the single turnover duty.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 9 of 30 -

a duty to exercise reasonable care in the areas of the ship under the active control of the vessel, and a duty to intervene.  *Id.*

a.    *The Turnover Duty*

A vessel owner's turnover duty has two parts: (1) the turnover duty of safe condition and the (2) turnover duty to warn.  *Howlett*, 512 U.S. at 98.  Only the turnover duty of safe condition is relevant in this case.[4]

The Supreme Court described the turnover duty of safe condition as follows:

> A vessel must "exercise ordinary care under the circumstances" to turn over the ship . . . "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service . . . will be able by the exercise of ordinary care" to carry on cargo operations.

*Id.*  (citations omitted; emphasis).  Put another way, the vessel's duty is to exercise ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its operations with reasonable safety to persons and property.  *Scindia*, 451 U.S. at 167.  The turnover duty of safe condition is not, however, grounded on general negligence principles.  Justice Powell explained in the *Scindia* case,

> The difficulty with a more general reasonableness standard . . . is that it fails to deal with the problems of allocating responsibility between the stevedore and the shipowner.  It may be that it is "reasonable" for a shipowner to rely on the stevedore to discover and avoid most obvious hazards.  But where, in a suit by a longshoreman, a jury is presented with the single question whether it was "reasonable" for the shipowner to fail to take action concerning a particular obvious hazard, the jury will be quite likely to find liability.  *If such an outcome were to become the norm, negligent stevedores would be receiving windfall recoveries* in the form of reimbursements for the statutory benefit payments [i.e., via the statutory longshore compensation lien] made to the injured longshoremen.  *This would decrease significantly the incentives toward safety of the party in*

---

[4]  The turnover duty to warn applies only to latent hazards.  *Howlett,* 512 U.S. at 98.  A hazard is latent if it is not known and not obvious or anticipated by the stevedore/longshoreman if reasonably competent in the performance of its work.  *Id.*  If it is assumed, solely for purposes of argument, that Abruska's two alleged vessel defects truly existed (i.e., (1) a third wire was missing and (2) a lower portion of the two-wire system was too loose), it cannot reasonably be argued that either condition was latent.  (As further explained below, neither condition genuinely existed.)

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 10 of 30 -

*the best position to prevent injuries and undercut the primary responsibility of that party for ensuring safety.*

*Scindia,* 451 U.S. at 181. *(J. Powell, concurring)*

The turnover duty of safe condition does not require a vessel be free of all foreseeable hazards. The duty relates only to hazards "that would prevent an expert and experienced stevedore from carrying on his operations in a reasonably safe manner." *Thomas v. Newton International Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994). Federal courts have consistently held that breach of the turnover duty of safe condition does not flow from all hazards that pose a danger to longshoremen; a breach only occurs if the hazard poses a danger to an *expert* and *experienced* longshore worker exercising reasonable care. *Ludwig v. Pan Ocean Shipping, Co.*, 941 F.2d 849, 852 (9th Cir. 1991).

In *Ludwig*, the Ninth Circuit held that "[i]n preparing the ship for a cargo operation, the vessel must exercise ordinary care in light of the fact that the operation will be conducted by an 'expert and experienced' stevedore. *This implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them."* *Id.* (emphasis); *see, also, Bjaranson v. Botelho Shipping Corp.*, 873 F.2d 1204, 1208 (9th Cir. 1988). The First Circuit has further explained the parameters of the duty:

> First, the vessel owner's "duty of safe condition" is met if the condition of the vessel when entrusted to the stevedore poses no reasonably foreseeable risk to any worker, even assuming a complete failure on the part of the stevedore-employer to monitor the vessel workplace for safety. On the other hand, because longshoring is particularly dangerous, in many respects inherently so, *see Johnson v. A/S Ivarans Rederi*, 613 F.2d 334, 339 n.5 (1st Cir. 1980), few on-board appurtenances would ever satisfy such an exacting threshold. *Accordingly, the "foreseeability" standard to which a vessel owner is held under its "duty of safe condition" has been relaxed:* "ordinary care under the circumstances" now governs the owner's discharge of its duty to turn the vessel over "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to conduct cargo operations "with reasonable safety to persons and property." *See Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 416-17 n. 18, 22 L. Ed. 2d 371, 89 S. Ct. 1144 (1969) (emphasis) (citation omitted).

*Keller v. United States*, 38 F.3d 16, 23-24, 1995 AMC 387, 403 (1st Cir. 1994).

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

Within the context of the turnover duty of safe condition, the relevant inquiry is not what is foreseeably dangerous to just *any person* aboard the vessel, but rather what is foreseeably dangerous to an *expert* and *experienced* longshoreman *exercising reasonable care*.

As further explained below, it matters not that plaintiff Abruska was an inexperienced longshoreman hired only hours before the incident. As a matter of law, vessel owners and charterers must assume that stevedore/employers are providing longshoremen working aboard their vessels who are expert, experienced and highly skilled.

Under *Scindia*, the assumed expertise and experience of the stevedore/longshoremen is also not tied simply to stevedoring or longshoring operations in general; the reliance of the vessel owner on the expertise and experience of the stevedore/longshoremen is tied instead to the *specific type of work being performed by the longshoremen*. *See*, *e.g.*, *Haines v. Honolulu Shipyard, Inc.*, 125 F. Supp. 2d 1020, 1028 (D. Haw. 2000) (ship repairer):

> Here, Plaintiff has not satisfied this burden because he has failed to set forth evidence demonstrating that an *<u>experienced</u> ship repair worker* could not, with the exercise of reasonable care, enter, exit, and work inside of the tank. Rather than establishing negligence under this standard, the evidence in this case supports the conclusion that an expert and experienced worker could have safely entered and exited the tank, despite the alleged shortcomings in the tank design.

Id. (emphasis).

In *Bandeen v. United Carriers (Panama), Inc.*, 712 F.2d 1336, (9th Cir. 1983), the Court held that the vessel owner was not liable under § 905(b) for failing to provide rigging between stanchions which could have prevented a longshore worker from falling overboard a lumber ship. *Id*. at 1240. The injury to the longshoreman occurred when the worker's fall was not broken by safety nets. The Ninth Circuit attributed the accident to the stevedore's failure to provide the safety nets. The vessel owner was exonerated.

### b.    Active Control

The second *Scindia* duty, applicable only after stevedoring operations begin, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "'active control of the vessel." *Howlett*, 512 U.S. at 98. A vessel owner is not involved

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

merely by being present or directing where goods are stowed. *Quevedo*, 143 F.3d at 1260 ("The issue is whether vessel personnel *directed* the unloading operations [.]"). Rather, the duty is implicated only where the vessel directs or controls the stevedore's operation or that portion of the gear that caused the injury. *Id.*

Since there was no control over the longshore operations occurring at that time of Abruska's accident other than by Abruska's own longshore employer, Northland Services, the "active control" duty is not genuinely relevant to Abruska's claim. No such breach has been alleged by Abruska.

> c.      *Duty to Intervene*

Under the narrowest of the Scindia duties, a vessel owner has a duty to act where there is both (1) a known danger to the longshoremen arising from a condition of the ship's gear being used in cargo operations and (2) the vessel could not reasonably expect the stevedore to remedy the situation. *Carpenter*, 924 F.2d at 1542. Under this standard, the shipowner's duty is greatly altered once cargo operations have begun. The shipowner is not charged with supervision of the stevedore's operations, and there is no duty to discovery danger. *See Webster v. M/V MOOLCHAND, Sethia Liners, Ltd.,* 730 F.2d 1035, 1986 AMC 2854 (5th Cir. 1984).

A court deciding a duty to intervene case must "tread cautiously" to avoid imposing liability on a vessel for negligence more properly attributable to the stevedore-employer. *Id.* Allowing expansive recovery would simply allow the stevedore/employer to escape responsibility for injuries to longshoremen (i.e., a stevedore-employer has the right to collect longshore benefits paid from a negligent vessel). *Id.* This was not the result intended by the Supreme Court in *Scindia*:

> The *Scindia* Court accordingly strictly limited a vessel's duty to intervene. It is not enough that the vessel knows or should know of a defect, and that the vessel knows the stevedore's actions have resulted in an unreasonable risk to longshoremen. It is further required that a part of the ship itself, the ship's "gear," cause the injury.

*Id.*

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 13 of 30 -

The duty to intervene arises only when the shipowner is aware that nothing is being done to correct the situation and he is in a position to prevent the harm.  An obvious predicate to liability under the "duty to intervene" is the actual presence and awareness of the owner or bareboat charterer.

### 3.    Significance of Plaintiff's Abruska's Inexperience

The status of Joseph Abruska as someone who was clearly _not_ an expert and experienced longshoreman is factually significant but not legally significant under § 905(b).

The factual significance of Abruska's inexperience is self-evident: he should have received (but did not receive) instruction, training and supervision from his employer, Northland Services. Abruska cannot recover if the only evidence of negligence arises from Northland Services' capacity as stevedore employer.

Conversely, Abruska's inexperience is not legally relevant in analyzing the duties owed by shipowners to longshoremen under _Scindia_.  Under _Scindia_, a vessel owner is entitled to rely (and by industry practice, must necessarily rely) on the experience and expertise of the stevedore and its longshoremen to perform their work safely and to comply with all safety standards.  _Ludwig v. Pan Ocean Shipping, Co.,_ 941 F.2d 849, 851 (9th Cir. 1991).  The vessel is also entitled to rely -- and will inevitably rely -- on the stevedore to select personnel trained and experienced in longshore operations.  See, Scindia, 451 U.S. at 172 ("The 1972 Amendments . . . did not undermine the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations.")

It is of no use for Abruska to claim he was underqualified to work aboard the barge in order to enhance the duties of Northland Vessel Leasing, Naknek Barge Lines or Northland Services (under its role as time-charterer.)  The Longshore Act does not allow for a discounted legal standard for inexperienced longshoremen.

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)

C.    The vessel defendants

Abruska has brought his § 905(b) claims against three defendants: (1) barge owner Northland Vessel Leasing; (2) bareboat charterer of the barge, Naknek Barge Lines; and, (3) longshore employer/time charterer Northland Services, Inc.

Since a claimant under § 905(b) may proceed against a defendant only in its capacity as vessel owner (or charterer) -- and not as employer -- the ownership or operational interest of each defendants in the BARANOF TRADER must be identified.

### 1.    Northland Vessel Leasing

Northland Vessel Leasing was at all times the true owner of the barge.  However, it bareboat chartered the BARANOF TRADER to Naknek Barge Lines.  *Docket No. 8, Ex. 1 at 1, 6.*

Under a bareboat charter, the owner surrenders all possession and control over the vessel.  Gilmore & Black, *The Law of Admiralty*, § 4-21, pg. 240 (2nd Ed. 1975); Harper, *Demise Charters:  Responsibilities of Owner or Charterer for Loss or Damage*, 49 Tul.L.Rev. 785, 785 (1975).

As owner, Northland Vessel Leasing faces no liability under § 905(b) because liability is imposed only due to ownership.  *See Kerr-McGee Corp. v. Law*, 479 F.2d 61, 63 (4th Cir. 1973)("This rule recognizes that when the owner of the vessel enters into a demise charter, he surrenders all possession and control of the vessel to the charterer.  Since he no longer has the right to control the use of the vessel, *he is no longer charged with the duties and liabilities that arise out of its ownership*.  Conversely, the demise charterer 'becomes subject to the duties and responsibilities of ownership'.") (emphasis); Schoenbaum, *Admiralty and Maritime Law*, § 11-3, pg. 204.

As a matter of law, Northland Vessel Leasing cannot be held liable under § 905(b) as a vessel owner.

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

2.        *Naknek Barge Lines*

Naknek Barge Lines bareboat chartered the BARANOF TRADER from Northland Vessel Leasing, thus assuming possession and control of the barge.  *See* Gilmore & Black, *The Law of Admiralty*, § 4-20, pg. 239 (2nd Ed. 1975).

The most important consequence of the distinction between the demise and the other forms of charters flows from the fact that the demise charterer is looked on as the owner of the vessel *pro hac vice*.  *Id.* at § 4-23, pg. 242.

Here, there is no dispute that Northland Vessel Leasing gave up possession, command and navigation of the BARANOF TRADER.  (As explained above and below, Northland Services, Inc. assumed dock-side control over the barge for cargo handling and lashing purposes.)  The crew members of the towing vessel were all Naknek Barge Line employees.  *Decl. of Ed Hiersche.* Northland Vessel Leasing had no crewman or other employees aboard the tug or barge and no employees involved in the movement of either vessel.  *Decl. of Barry Hachler.*

Nakek Barge Lines is the proper vessel owner for § 905(b) purposes.

3.        *Northland Services, Inc.*

Northland Services is involved in this case in two ways.  First, it was the employer of plaintiff Abruska.  As the longshore employer, Northland Services is liable for -- and has paid -- all of the longshore benefits Abruska has and continues to receive.  33 U.S.C. § 901, *et. seq*. Northland's liability arose automatically and regardless of fault because of its employment relationship with Abruska.  As employer, Northland Services has had its liability statutorily determined.

Northland Services was also the time charterer of the BARANOF TRADER.  A time charterer hires the vessel to carry the charterer's goods; however, the vessel owner [or owner *pro hac vice*] remains in navigational control of the vessel.  Schoenbaum, *Admiralty and Maritime Law*, §11-1 at 3 (4th Ed. 2004).  Under Ninth Circuit precedent, a time charter may also, under

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

limited circumstances, be held liable under § 905(b) as a vessel owner.  *Rodriquez v. Bowhead Transportation Corp.*, 270 F.3d 1283, 1286 (9th Cir. 2001).[5]

Evaluating the liability of Northland Services as a vessel owner under § 905(b) (distinct from its role as longshore employer) raises a second issue: that of a dual capacity defendant. Northland Services, as Abruska's employer, has already been held liable for payment to Abruska of his statutory longshore benefits.  Thus, Northland Services does not face further liability as *employer* under the Longshore Act.  In order to recover against Northland Services, Abruska must show that the negligence which caused his injuries arose in Northland Services' capacity as the *vessel owner* (charterer) and not as *employer*.  *Gravatt*, 226 F.3d at 120 ("Insofar as the employer-vessel is negligent in its *stevedore-employer capacity*, it is immune from suit under § 905(a).")  Abruska is barred from further recovery if the negligence that caused his injuries occurred in Northland's capacity as employer.  *Id.*

In drafting § 905(b), Congress sought to provide the same result (in terms of recovery) regardless of whether the covered work was performed by an independent stevedore company or by the vessel through personnel it hired directly.  *Gravatt,* at 123.  A straight application of *Scindia* duties would violate this principle.  *Id.*

> The application of *Scindia's* second and third prongs -- the active control duty and the duty to intervene upon actual knowledge -- to the circumstances where the harbor-work contractor and the owner of the vessel are the same entity is more problematic.  Where the contracted service is performed by employees of the entity that owns the vessel, by definition the vessel owner would have "actively involved" itself in the operation and would have "actual knowledge" of the failure of the personnel undertaking the task to operate in a matter that protected their coworkers from danger. Thus, if any "active control" or "actual knowledge" on the part of the dual-capacity defendant were sufficient to constitute actionable negligence under 905(b) -- regardless whether the defendant took control or had knowledge in its employer capacity or its vessel capacity -- the availability of a tort remedy against the vessel would turn on whether the harbor-working operations where performed by a contractor independent of the vessel or by the same entity that owned the vessel . . . Harbor-working employees . . . would have more expansive tort remedies if employed by a dual-capacity

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

---

[5]  In *Bowhead*, the court exonerated the time charterer of liability because it had no involvement in the subject cargo operations.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 17 of 30 -

1
2
3

> employer-vessel owner than they would have if employed by a independent contractor. By the same token, the dual-capacity employer-vessel owner would have greater liabilities than if the work arrangement involved a single-capacity employer and a third-party vessel. . . . _This result_ would _be contrary to the express intent of Congress_[.]  *Id.  (emphasis)*

4     In order to deal with the conceptual problems of the dual-capacity defendant, a court must

5 divide the defendant into a hypothetical vessel and employer. *Gravatt*, at 124*, citing, Morehead v.*

6 *Atkinson-Kiewit*, J/V, 97 F.3d 603, 613 (1st Cir. 1996). The Court must then analyze "the

7 allegedly negligent conduct to determine whether that conduct was performed in the course of the

8 operation of the owner's vessel as a *vessel* or whether the conduct was performed in furtherance of

9 the employer's harbor-working [longshore] operations." *Id.* at 125. Negligence as employer is not

10 actionable under 905(b). *Id.*

11     C.     Negligence allegations and *Scindia*

12         *1.*     *Allegations relating to Turnover Duty of Safe Condition*

13             *a.*     *Lack of a third wire*

14     The first of Abruska's two allegations against defendants is that a third perimeter safety

15 wire could have prevented his accident and should therefore have been in place on the BARANOF

16 TRADER. He argues that a third perimeter wire was required by a Coast Guard regulation, with

17 the absence of such a wire a breach of the turnover duty under *Scindia*. This Court has previously

18 determined, however, that Abruska failed to prove that the Coast Guard regulation at issue even

19 applies to the BARANOF TRADER. *Dkt. 11, Jun 3, 2005, ORDER, denying summary judgment*.[6]

20 Even if the regulation were applicable to the barge, breach of the regulation would not support a

21 verdict against any of the vessel defendants under § 905(b).

22     Firstly, every longshoreman is presumed by law to be an expert who is required to be

23 'mindful' of hazards, not forgetful of them.[7] *Polizzi v. M/V ZEPHYROS II* MONROVIA, 860 F.2d

24 147, 149 (5th Cir. 1988). Thus, even if there were a regulatory violation, Naknek Barge Lines and

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

25
26

---

[6] Plaintiff's prior motion addressed a single, distinct issue; i.e., whether a Coast Guard regulation required three perimeter wires on the barge. Whether the regulation, if applicable, was relevant to *longshoremen* or *longshore activities* was not earlier raised by plaintiff. *Docket No. 8.*
[7] As further explained below, there is no evidence that the two-wire system was a 'hazard.'

Northland Vessel Leasing breached no turnover duty because the "missing" wire was an open and obvious condition aboard the BARANOF TRADER. Defendants had no duty to anticipate the action or inaction of a careless longshoreman. *Id.*

Next, the regulation cited by plaintiff (ostensibly requiring a third perimeter wire) offers no guidance in analyzing the turnover duty of safe condition with respect to expert and experienced longshoremen exercising reasonable care. *Bjaranson,* 873 F.2d at 1208. The regulation -- if proven to be applicable to the barge -- may provide evidence of a theoretical hazard, but evidence of such a potential hazard does not establish a breach of a turnover duty with respect to expert and experienced longshoremen. *Id.*

> This Court recognizes that a reasonable juror could, arguably, find the ladder to be a "hazard." However, *such a general conclusion does not in and of itself end the analysis. More is required*, namely, the plaintiff must introduce evidence that the hazard was such that an *expert* and *experienced* stevedore would not "be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property."

*Id.* (emphasis) *(*reversing a trial court judgment in favor of longshoreman because judgment not supported by the evidence). A regulation such as an OSHA or Coast Guard regulation provides evidence, at most, of a *general* hazard. *See Haines v. Honolulu Shipyard, Inc.*, 125 F. Supp. 2d 1020, 1028 (D. Haw. 2000)(emphasis).

In *Haines*, the plaintiff/longshoreman turned to an OSHA regulation to avoid a vessel owner's motion for summary judgment. The issue was the turnover duty of safe condition. *Id.* In granting summary judgment in favor of the vessel, the district court ruled that OSHA regulations did not establish "a genuine issue of material fact as to the issue of whether the Government breached the turnover duty of safe condition." *Id.* The court explained why the OSHA regulations offer little help in analyzing duties under § 905(b):

> Plaintiff attempts to rely on regulations promulgated by the Occupational Safety and Health Administration ("OSHA") to establish that the Government breached this duty. Plaintiff's reliance on these regulations is unpersuasive for three reasons. . . . Second, caselaw, as discussed above, has defined the turnover duty of safe conditions as set forth in parameters. . . . *Although OSHA regulations may set forth various safety requirements,*

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)

> *they neither define nor discuss what designs or conditions are safe or unsafe for a **skilled** worker exercising reasonable care*.  The regulations therefore shed little light on whether the turnover duty of safe conditions was breached here.

*Id.* (emphasis).

In the immediate case, Abruska cannot prove that the absence of a third wire -- even if a third wire were required by regulation -- breached the turnover duty of safe condition.  While Abruska might point to a *Coast Guard* regulation requiring *manned* barges to have a third wire, Abruska has not and cannot offer evidence that the absence of a third wire on an *unmanned* barge represents a danger to *expert* and *experienced* longshoremen exercising reasonable care.

The Coast Guard protects seamen ("wards of the Court") and other merchant marine personnel; the Coast Guard does not regulate or have enforcement authority over *longshore* activities.[8]  The specific regulation cited by plaintiff is a Coast Guard regulation, not an OSHA regulation.  *46 C.F.R. § 92.25-5.*  Under a memorandum of understanding between OSHA and the Coast Guard, Coast Guard regulates the "safety and health of *seamen* onboard vessels which are inspected and certified by the U.S. Coast Guard."  *OSHA Directive, CPL 2-1.20 – OSHA/U.S. Coast Guard Authority Over Vessels.*  "OSHA regulates the working conditions of employees, *other than seamen*[.]"  *Id.*  (emphasis)

If, as explained in *Haines,* an OSHA regulation provides little evidence of dangers to expert and experienced longshoremen, a *Coast Guard* regulation provides even less evidence of such purported dangers.

OSHA, for its part, says nothing about a three-wire system on barges.  The regulations found in 29 CFR Part 1918 govern longshoring operations aboard vessels (including barges).  29 CFR § 1918.36 is the closest OSHA gets to discussing perimeter barge wires.  Nothing is said about a three-wire requirement:

---

[8]  46 USC § 2103.  Superintendence of the merchant marine.  The Secretary has general superintendence over the merchant marine of the United States and of merchant marine personnel insofar as the enforcement of this subtitle [46 USCS §§ 2101 et seq.] is concerned and *insofar as those vessels and personnel are not subject, under other law, to the supervision of another official of the United States Government.*

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

> *Removable weather deck rails shall be kept in place except when cargo operations require them to be removed, in which case they shall be replaced as soon as such cargo operations are completed.*  29 CFR § 1918.36.[9]

In order to establish the relevance of the Coast Guard regulation, Abruska must show that a two wire barge is dangerous to an expert and experienced longshoremen.  Abruska has not and cannot at this point develop such evidence.  All of the testimony and other evidence (including regulations) confirms that two perimeter wires are adequate and safe for expert and experienced longshoremen.

Three witnesses involved in the immediate litigation have offered opinions about perimeter barge wires.  All three witnesses agree that (a) a two-wire system is the accepted industry standard and known work environment for barge longshoreme,  or, more specifically, (b) a two wire barge is safe for an expert and experience stevedore exercising reasonable care.

<u>Leo Naekel</u> (defense expert):  Mr. Naekel has worked over thirty years loading, stowing lashing and lightering barge cargo throughout Alaska and the Northwest.  *Exhibit A, Declaration of Leo Naekel.*  Mr. Naekel has offered written opinions about the BARANOF TRADER that include the following:

- there was sufficient room between the barge containers and the perimeter safety hand rail wire for longshoremen to move safely fore and aft on the barge and perform lashing work;
- the perimeter two wire system is what Mr. Naekel has "encountered on the Lower 48 west coast, and most ports in Alaska, for over 30 years;"
- the barge was reasonably safe for expert and experienced longshoremen.

*Id.*

Mr. Naekel's opinions affirm that expert and experienced stevedores and their longshoremen expect to encounter (and inevitably do encounter in their work) a two wire barge system.

---

[9]  29 CFR  1918.35 ("Open hatches") addresses OSHA's concern about open cargo hatches on deck.  The regulation requires only "taut lines or barricades at a height of 36 to 42 inches above the deck."  As in § 1918.36, there is no mention of a three-wire requirement.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 21 of 30 -

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

Bill Emory (Northland Services Operations Manager): Mr. Emory testified at his deposition in Anchorage: "Have you ever seen a barge with more than two railings?" *No.* "Have you ever seen a barge with less than two railings?" *Yes. Ex. 1*, p. 21. "Have you ever heard or seen of someone falling over the side of a barge, of a Northland Services barge?" *No. Ex. 1*, p. 113. Mr. Emory also explained the importance of vigilance when working aboard barges: "[T]he safety lines [in the middle of the barge] are all the time taken down to move cargo back and forth, put back up." *Ex. 1*, p. 23. Mr. Emory confirmed that "OSHA spends a lot of time on our barges." *Ex. 1*, p. 22. There is no evidence or any indication whatsoever that OHSA has ever disapproved of the two-wire system on unmanned cargo barges.

Luke Donkersloot (Northland Services Barge Master): Mr. Donkersloot testified at his deposition in Naknek that a two-wire system is the industry standard: "Have you ever seen a barge similar to the BARANOF TRADER that has three wire railings?" *No.* "Have you ever seen a barge at all that has three wire railings?" *I don't think so.* . . . "[H]ave you ever seen anybody fall over the side of a barge." *No. Ex. 3*, p. 24; 27. [10]

The undisputed evidence offered by the only experienced longshoremen in the litigation is that a three-wire barge system is virtually unknown to expert and experienced longshoremen. Likewise, there is no evidence that a three-wire system is required by any applicable regulation. Because longshoremen have been working safely -- for decades -- on flat-deck cargo barges in Alaska and Washington with two perimeter wires, in the absence of any applicable regulation to the contrary, the evidence of a reasonably safe work place for longshoremen cannot genuinely be controverted. *See, e.g., Haines*, 125 F. Supp. 2d at 1028:

> Here, Plaintiff has not satisfied this burden because he has failed to set forth evidence demonstrating that an experienced ship repair worker could not, with the exercise of reasonable care, enter, exit, and work inside of the tank. Rather than establishing negligence under this standard, the evidence in this case supports the conclusion that an expert and

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

---

[10]  Mr. Donkersloot later offered a more candid opinion about barge work: "I mean it's a barge, it's tied up to the dock, it's moving around and you're not careful, you could fall off anywhere." *Ex. 3*, p. 34.

experienced worker could have safely entered and exited the tank, despite the alleged shortcomings in the tank design. *Employees of HSI had entered the tank on at least one occasion prior to Plaintiff's accident. . . . In addition, Plaintiff himself had safely entered the tank on the day of the accident. . . . These facts suggest that the tank was indeed safe for experienced workers*. Plaintiff has failed to set forth any evidence otherwise. (emphasis)

Under the *Scindia* duty of safe condition, a vessel owner does not have to provide a perfectly safe vessel, free from all hazards. *Ludwig*, 941 F.2d at 852. The owner merely has to provide a vessel reasonably safe for an expert and experienced stevedore exercising reasonable care. *Id*.

As in *Haines,* Abruska has no evidence to counter or discredit Leo Naekel's expert opinion, nor the testimony of experienced longshoremen Emory and Donkersloot. Abruska's lay opinion -- based merely on his three hours work as a barge lasher -- cannot create a genuine issue about the alleged need for a third perimeter wire or longshore safety or the turnover duty. There is, in sum, no genuine dispute that the absence of a third safety wire was neither a "hazard" nor a breach of the turnover duty of safe condition. Consequently, there can be no § 905(b) liability for any vessel owner based on the lack of a third wire.

b.    *Allegedly loose second wire*

As a second alleged cause of the accident, plaintiff contends that the lower safety wire was loose. The allegation is factually baseless.

Barge Master Luke Donkersloot clarified, first, that he (or some other longshore employer of Northland Services) regularly inspects the barges arriving in Naknek. As part of its inspection, Northland Services tightens any safety wires that are determined to be loose: "If something's broke, it will be pointed out otherwise it's [a loose wire] usually just repaired, tightened up." *Ex. 3,* p. 10. As for the wire that Abruska contends contributed to him falling overboard, Donkersloot testified, "[i]t wasn't particularly loose; it wasn't tight but it wasn't -- it was still workable." *Ex. 3,* p. 20. Donkersloot also explained, "some of these wires are just -- are loose on there . . . . They get -- they get fixed just as much -- I mean, it's the barges. There are cranes swinging boxes and

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 23 of 30 -

things like that. . . .  They get tightened -- they [get] loose and they get taken down and they get put back up.  But it was up [the wire] and everybody was working around it fine and it wasn't a problem."  *Ex. 3*, p. 22-23  If a loose wire had been a concern to Northland Services, the remedy was easily had: "Put a turnbuckle on it."  *Ex. 3*, p. 21.  After Abruska's accident, Donkersloot inspected the area and found nothing amiss except a frayed (but not loose) wire: "the one picture I took of the freight [sic] end of the safety line was the most unusual thing but it's not uncommon." *Ex. 3*, 36.

Operations Manager Bill Emory also confirmed that the perimeter wire was not loose in the area where Abruska fell.  *Ex. 1*, pg. 29.  He testified, however, that a loose wire was neither uncommon nor something that was ignored by Northland Services: "Do you have to tighten the safety wires?"  *All the time. . . .  They get knocked down by freight, the wires get knocked by tugboats assisting or hitting the dock.  Numerous scenarios why a safety line would get loosened. Sometimes not very loose at all.  Other times you might go in and cream a dock and take the whole thing out.  Ex. 1*, p. 25.  Emory also testified that tightening barges wire was an ordinary item of *maintenance* for Northland Services performed on the barges arriving in Naknek.  *Ex. 1*, p. 77.  In fact, Northland Services even replaces the perimeter barge wire, if necessary, as part of its work on the BARANOF TRADER.  *Ex. 1*, p. 80.  Emory further clarified that he or Luke Donkersloot -- both managers of Northland Services -- inspected the BARANOF TRADER when it arrived on the day prior to Abruska's injury.  *Ex. 1*, p. 56.  To the extent Abruska believes (accurately or not) that portions of the perimeter wire were too loose, he necessarily must recognize that his own Northland Services' supervisors failed to identify or correct the condition.

Abruska inevitably contends that a barge perimeter wire anything less than perfectly tight is both loose and hazardous.  To the extent the barge wire was overly loose -- which nobody except Abruska seems to believe -- then, the fault lies with Northland Services: it neither identified nor took steps to correct the alleged loose wire (after admittedly accepting the duty to inspect for loose wires).

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

Properly considered, Abruska's allegations about the loose and hazardous wire are neither accurate nor supported by reliable evidence. The experienced longshoremen working on the BARANOF TRADER (Donkersloot and Emory) testified the barge was no different than any barge they've ever worked aboard. Defense expert Leo Naekel confirmed the barge was safe for longshore work. Abruska has not developed or disclosed any evidence to the contrary. Without such evidence, the vessel defendants are entitled to summary judgment on all claims brought under § 905(b) based on an alleged missing or loose wire and the turnover duty.

2.       *Allegations relating to Duty of Active Control.*

Abruska has, for good reason, made no allegation against vessel defendants related to the "active control" duties. No vessel defendant other than Abruska's statutorily-immune employer -- Northland Services -- had "active control" over the vessel during the stevedore operations.

a.       *Northland Vessel Leasing*

Northland Vessel Leasing had no "active control" because it had no employees whatsoever, much less employees working on barges in Naknek.[11] *Decl. of Barry Hachler.* It bareboat chartered the boat to Naknek Barge Lines prior to the accident and, in so doing, gave up all aspects of control over the vessel. As such, Northland Vessel Leasing cannot be held liable for breach of the active control duty.

b.       *Naknek Barge Lines*

Naknek Barge Lines had personnel aboard the barge during operations, but the mere presence of employees does not create "active control." *Quevedo*, 143 F.2d at 1260. The issue is "control," not merely involvement. *Id.* A vessel owner has to either control the details of the stevedoring operation or the area of the barge where the plaintiff was injured. *Id.*

Here, Naknek Barge Lines personnel had no control over any aspect of the stevedore operations. Northland Services, as stevedore/employer, directed and controlled the actions of the

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

---

[11] Northland Services managers Emory and Donkersloot (both based in Naknek) testified they had never even heard of an entity named "Northland Vessel Leasing." *Ex. 1, p. 70; Ex. 3, p. 7.*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 25 of 30 -

Naknek Barge personnel working under Northland Services (i.e., Bill Emory) aboard the barge. *Ex. 1*, p. 74-75. Mr. Emory explained,

> Q    When the Naknek crew was on the barge, including the BARANOF TRADER, who's in charge of the Naknel crew when it's lashing and loading?
>
> A    Naknek, the Naknek Northland Crew [sic] or Naknek Barge Lines?
>
> Q    The Naknek Barge Lines crew, when they're lashing and unlashing, who's in charge of those people?
>
> A.    Northland's in charge the whole time.

*Ex. 1*, pg. 114.

Given that the Naknek Barge Lines crew was operating at all relevant times under the direction of Northland Services, there is no factual basis to support a finding that Naknek Barge Lines had direction or control over the operations or equipment of aboard the BARANOF TRADER.

### c.    Northland Services, Inc.

Analyzing the liability of Northland Services under the active control duty is more complex, but its role as employer and supervisor of Abruska leaves no genuine issue on legal duties.

As the Second Circuit recognized in *Gravatt*, Northland Services in some sense had control of the BARANOF TRADER in its role as dual-capacity employer. *Gravatt*, 226 F.3d at 123. In order for Abruska to prevail on his claims against Northland Services, however, he must offer evidence of negligence by Northland Services in its capacity as *vessel owner* and not as Abruska's *employer. Id.* More specifically, Abruska may recover for breach of the active control duty only if Northland Services had control over the stevedoring operations in its capacity as *time charterer* of the vessel. It is a burden Abruska cannot meet.

Using the analysis from *Gravett* to break Northland Services into a hypothethical time charterer vs. stevedore/employer clarifies the active control analysis of a dual-capacity employer.

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

As *time charterer*, Northland Services had no personnel in Naknek and played no part in the stevedore operations. *Decl. of Barry Hackler; see also, Ex 1*, p. 106-107. ("[D]oes Northland Services have any other operation in Naknek, other than barge loading and unloading?" *No*.)  In contrast, Northland Services -- *as stevedore/employer* -- had full and active control over the BARANOF TRADER for longshoring purposes and, as such, had full responsibility for the safety of the longshoremen working for it.  29 CFR 1910.1; 29 CFR 1918.1 *et seq*.; *depositions of Emory and Donkersloot, supra; see also*, *Bandeen*, 712 F.2d at 1341 ("The statutory scheme now places the duty of providing safety appliances upon the stevedore, and the stevedore remains liable for injuries to workmen that result from any such failure[.]")

Northland Services cannot be found liable under § 905(b) because its stevedore/employer liability is already imposed and determined under the Longshore Act.  Northland Services was acting as a stevedore/longshore employer aboard the BARANOF TRADER.  As a time charterer (its vessel capacity for § 905(b) purposes) it could not exercise control over the stevedore operations nor the vessel itself.  As a matter of law, Northland Services cannot not be liable for a breach of the active control duty.

### 3.     *Allegations Relating to the Duty to Intervene*

The only possible grounds for raising a duty to intervene argument against the vessel defendants is Abruska's allegation of a loose second safety wire.  *Carpenter*, 924 F.2d at 1542 (duty to intervene requires that "ship's gear" cause the injury).  As discussed above, there is no credible evidence the wire was unreasonably or dangerously loose.  More importantly, for consideration of the duty to intervene, Abruska must prove both that the vessel defendants (Northland Vessel Leasing or Naknek Barge Lines) knew the wire was loose *and* that it posed an unreasonable risk of harm to the longshoremen.  *Id*.  It is a burden Abruska cannot meet.

Northland Vessel Leasing, as bareboat charterer, had no employees in Alaska or aboard the BARANOF TRADER.  *Decl. of Barry Hachler*.  It had no involvement whatsoever in the

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

stevedore operations. *Supra.* It did not know -- and could not have known -- of any alleged loose wire.

Naknek Barge Lines had personnel aboard the barge, but there is no evidence those personnel believed the wire to be either loose or hazardous. There is no evidence, in fact, that Naknek Barge Lines personnel were ever working near enough to Abruska to know anything about the condition of the barge wire. For their part, the experienced longshoremen (Emory and Donkersloot) and the only longshore expert (Naekel) testified that the loose wire was not a hazard to expert and experienced longshoremen. Abruska offers no evidence the loose wire represented a danger, much less a danger that was recognized by Naknek Barge Lines personnel.

Northland Services, as time charterer, had no knowledge of the conditions aboard the barge. It had no personnel at the dock and was not engaged in any vessel operations. *Decl. of Barry Hachler.* All Northland Services personnel in Alaska were employed and working in their stevedore or longshore capacities. *Id.*

Abruska has made no allegation with respect to the duty to intervene. There is no factual or legal basis for any such allegation.

D.    Northland Services' (Non)Liability as Employer

The *Scindia* duties under § 905(b) are designed to protect a longshoreman from injuries caused by the negligence of the vessel. It is not designed to enhance the injured longshoreman's benefits under the Act for injuries caused by his employer. In this case, the injuries suffered by Abruska were caused by either his own inattention or by negligence of his longshore employer, Northland Services. Northland Services, as employer, should have, but did not, train, orient and supervise Abruska. To the extent the perimeter wire could have been tightened, Northland Services, as employer, had the duty to identify the problem and correct it. Likewise, a flashlight could have been provided (but was not) if lighting was insufficient.

While the negligence of Northland Services as employer may have caused or contributed to the accident, it is not grounds for imposing liability on Northland Vessel Leasing, Naknek Barge

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

Lines, or Northland Services, Inc. *as time charterer*. Northland Services, as employer, has already been adjudged liable under the Longshore Act. It has and continues to pay costs related to the accident to Abruska.

IV      CONCLUSION

The changes made to the Longshore Act by Congress in 1972 were designed "to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." Northland Services was Abruska's employer and was best able to prevent the injury that occurred almost three years ago.

Abruska has failed to set forth any genuine evidence establishing liability against any of the defendants. Defendants respectfully ask the Court to dismiss all claims, under all theories of liability, advanced against them.

DATED this 2nd day of May, 2006.

BAUER MOYNIHAN & JOHNSON LLP


/s/ Thomas G. Waller
_____
Thomas G. Waller, Alaska Bar No. 0109052
Attorneys for Defendants
2101 Fourth Avenue, Suite 2400
Seattle, Washington 98121
Tel: 206-443-3400
Fax: 206-448-9076
E-mail: tgwaller@bmjlaw.com

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA 98121

(206) 443-3400
FAX (206) 448-9076

CERTIFICATE OF SERVICE

I declare under penalty of perjury of the laws of the state of Washington that on May 2, 2006 I electronically filed the above document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

E-mail: cjs@acglaw.com

s/Suya Edwards

_____

Suya Edwards

E-mail: sedwards@bmjlaw.com

ATTORNEYS AT LAW

BAUER
MOYNIHAN
& JOHNSON LLP

2101 FOURTH AVENUE
SUITE 2400
SEATTLE, WA  98121

(206) 443-3400
FAX (206) 448-9076

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Abruska / Northland; No. A04-209 CV (JKS)
- 30 of 30 -