Case 3:04-cv-00209-TMB   Document 34-12   Filed 05/03/2006   Page 1 of 10
ABRUSKA v NORTHLAND VESSEL LEASING, ET AL.
WILLIAM EMORY
9/28/2005

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF ALASKA AT ANCHORAGE
 3    _____
 4    JOSEPH ABRUSKA,                  )
                                       )
                Plaintiff,             )
 5                                     )
      vs.                              )
 6                                     )
      NORTHLAND VESSEL LEASING         )
 7    COMPANY, LLC and NAKNEK          )
      BARGE, LLC,                      )
 8                                     )
                Defendants.            )
 9    _____)
      Case No. A04-209 CV (JKS)
10
11
12    _____
      VIDEOTAPED DEPOSITION OF WILLIAM "BILL" EMORY
13    _____
14
                     Pages 1 - 116
15          Wednesday, September 28, 2005
                     1:35 P.M.
16
            Taken by Counsel for Plaintiff
17                         at
               Atkinson, Conway & Gagnon
18             420 L Street, Suite 500
                  Anchorage, Alaska
```

```
                                                              Page 2
 1                    A-P-P-E-A-R-A-N-C-E-S
 2
     For Plaintiff:
 3      Christopher J. Slottee
        Neil T. O'Donnell
 4      ATKINSON CONWAY & GAGNON, INC.
        420 L Street, Fifth Floor
 5      Anchorage, Alaska 99501
        907/276-1700
 6
 7
     For Defendants:
 8      Thomas G. Waller
        BAUER, MOYNIHAN & JOHNSON, LLP
 9      2101 Fourth Avenue, Suite 2400
        Seattle, Washington 98121
10      206/443-3400
11
     Also Present:
12      Barry Hachler
13
     Videographer:
14      Martha Enslow
        MEDIA IMPRESSIONS
15
     Court Reporter:
16      Lisa L. Shaffer
        PACIFIC RIM REPORTING
17      711 M Street, Suite 4
        Anchorage, Alaska 99501
18
19
20
21
22
23
24
25
```

```
                                                            Page 3
 1                       I-N-D-E-X

 2   EXAMINATION BY                                         PAGE

 3      Mr. Slottee                                          5

 4      Mr. Waller                                          113

 5

 6

 7
     EXHIBITS                                               PAGE
 8
        1    Incident Investigation Report (6 pgs.)          15
 9
        2    Photocopy of Color Photograph (1 pg.)           26
10
        3    Photocopy of Color Photograph (1 pg.)           27
11
        4    Color Photograph                                28
12
        5    Vessel Deployment for 2003 Season and Daily     67
13           Position Report (2 pgs.)

14
        6    Packet of E-mails (9 pgs.)                      82
15
        7    Northland Services, Inc., Incident Reporting    98
16           Notice (1 pg.)

17
        8    Northland Services, Inc., Time Summary for      99
18           S. Franklin (2 pgs.)

19
        9    Northland Services, Inc., Time Summary for      99
20           L. Donkersloot (2 pgs.)

21

22

23

24

25
```

Page 4

1  ANCHORAGE, ALASKA; WEDNESDAY, SEPTEMBER 28, 2005
2                        1:35 P.M.
3                         -o0o-
4       VIDEOGRAPHER: My name is Martha Enslow of
5  Media Impressions, P.O. Box 112081, Anchorage, Alaska
6  99511. I'm the videographer representing Pacific Rim
7  Reporting.
8       It is the 28th day of September of the year
9  2005. We are on record at 1:35 p.m. We are at the
10 offices of Atkinson, Conway & Gagnon to take the
11 deposition of Bill Emory in Case No. A04-209 Civil,
12 Joseph Abruska versus Northland Vessel Leasing
13 Company, et al.
14      At this time I would like everyone in the
15 room to identify themselves verbally.
16      MR. SLOTTEE: Chris Slottee for plaintiff.
17      THE WITNESS: Bill Emory.
18      MR. WALLER: Tom Waller for defendants.
19      MR. HACHLER: I'm Barry Hachler. I'm with
20 Northland Services.
21      VIDEOGRAPHER: Are there any stipulations the
22 parties would like to have on the record before we
23 begin?
24      MR. SLOTTEE: No.
25                        -o0o-

Page 5

1              WILLIAM "BILL" EMORY,
2         deponent herein, being sworn on oath,
3         was examined and testified as follows:
4                    EXAMINATION
5  BY MR. SLOTTEE:
6   Q  Okay. Mr. Emory, we met before. I'm Chris
7  Slottee, I represent Joseph Abruska.
8       Have you ever had your deposition taken
9  before?
10  A  No.
11  Q  Okay. Do you understand that testifying in
12 this deposition is the same as testifying at trial?
13  A  Uh-huh.
14  Q  If you have any questions about a question I
15 ask or if you don't understand it, just speak up and
16 let me know, and I'll try to rephrase it or, you know,
17 reword the question to make it more understandable,
18 otherwise I'm going to assume that you understand the
19 question.
20  A  Okay.
21  Q  In preparing for this deposition, did you
22 look at anything to prepare for the deposition?
23      MR. WALLER: Objection. Form.
24 BY MR. SLOTTEE:
25  Q  You can answer. Did you look at anything

Page 6

1  when you were preparing for the deposition?
2       MR. WALLER: Objection. Form. It's not
3  proper. It's attorney-client privilege.
4       MR. SLOTTEE: Okay. You're not going to let
5  him say what documents he looked at?
6       MR. WALLER: If there was something that
7  refreshed his memory, you're entitled to know that.
8  BY MR. SLOTTEE:
9   Q  Okay. Did you look at any documents to
10 refresh your memory in preparation for this
11 deposition?
12  A  Yes.
13  Q  What did you look at?
14  A  The investigation report done by Ben Burns.
15  Q  Okay. Did you look at anything else?
16  A  No.
17  Q  Did you talk to anyone aside from your
18 attorney, Mr. Waller, in preparation for this
19 deposition?
20  A  No.
21  Q  Now, how long have you worked for -- well,
22 first off, strike that.
23      Who do you work for? Do you work for
24 Northland Services?
25  A  I work for Northland Services.

Page 7

1   Q  Do you work for Northland Vessel Leasing
2  Company?
3   A  No.
4   Q  Do you work for Naknek Barge Lines?
5   A  No.
6   Q  How long have you worked for Northland
7  Services?
8   A  15 years.
9   Q  And where is your job position? Do you work
10 in Naknek?
11  A  I am Bristol Bay and Dutch Harbor operations
12 manager.
13  Q  Okay. And what does that entail? What are
14 your job duties?
15  A  Oversee the operations of both ports.
16  Q  Do you spend time in Naknek? Do you work in
17 Naknek for part of the year?
18  A  Yes.
19  Q  Okay. And you work for part of the year in
20 Dutch Harbor?
21  A  Yes.
22  Q  Do you work anywhere else?
23  A  Ports in between, yeah. Ports in between
24 Naknek and Dutch. We have ports in between.
25  Q  Okay. What ports?

Page 16

1  Q  Do you remember about how long after Joseph's
2  accident that he contacted you?
3  A  Probably a few days.
4  Q  Was it by telephone or was it in person?
5  A  Telephone.
6  Q  Did he talk to you with Luke Donkersloot
7  present, or did he talk to you separately?
8  A  Separately. He talked to me on the phone. I
9  don't remember if Ben came up after that or not. I
10 don't think so.
11 Q  What did he ask you?
12 A  He just asked for the -- you know, what had
13 happened.
14 Q  Okay. And what did you tell him?
15    MR. WALLER: Objection. Form.
16 A  Can you repeat the question?
17 BY MR. SLOTTEE:
18 Q  What did you tell Ben Burns when he asked you
19 what had happened?
20 A  I told him that we had a guy that had fallen.
21 Q  Did you actually witness the accident?
22 A  No.
23 Q  And what did Ben Burns say to you about the
24 accident?
25 A  I don't understand the question.

Page 17

1  Q  Well, you said Ben Burns called you to ask
2  you about the accident and you told him what had
3  happened.
4  A  That Joseph had fallen, we had taken him to
5  the clinic and he was going to get medevaced. That
6  was the extent of the conversation.
7  Q  And Ben Burns didn't say anything in response
8  to that?
9  A  Not that I remember, no.
10 Q  Do you know what Luke Donkersloot told Ben
11 Burns?
12 A  No.
13 Q  Did anyone else besides Ben Burns from
14 Northland Services follow up with you after the
15 accident?
16 A  No.
17 Q  Have you ever seen any other report
18 referencing the accident?
19 A  Seen what?
20 Q  Any other report or --
21 A  No.
22 Q  Did you have to make a filing with OSHA?
23 A  No, not out of the Naknek office.
24 Q  Now, about how many barges have you worked on
25 for Northland Services?

Page 18

1  A  Several hundred.
2  Q  Are they all similar to the BARANOF TRADER,
3  or are there differences between them?
4     MR. WALLER: Objection. Form.
5  A  Can you repeat the question?
6  BY MR. SLOTTEE:
7  Q  That's actually not a very good question.
8     Have you worked on the BARANOF TRADER?
9  A  Yes.
10 Q  Are you familiar with the BARANOF TRADER?
11 A  Yes.
12 Q  About how many times have you worked on the
13 BARANOF TRADER?
14 A  Countless.
15 Q  Is the BARANOF TRADER -- is it considered a
16 lighterage barge?
17 A  A lighterage barge, yes. It's a 230 barge.
18 It's one of our smaller barges.
19 Q  Okay. A 230 barge, what does that mean?
20 A  230 feet.
21 Q  And that's the length of the barge?
22 A  Yes.
23 Q  And that's one of your -- Northland Services'
24 smaller barges?
25 A  Yeah. Medium size. I mean, we have smaller

Page 19

1  and we have larger.
2  Q  Okay. When was the last time you worked on
3  the BARANOF TRADER?
4  A  Here about six weeks ago, eight weeks ago.
5  Q  And what were you doing then?
6  A  We prepped that barge and used it for
7  southbound sailing with canned salmon. We prepped it
8  in Naknek and it sailed canned salmon out of Alitak.
9  Q  When you say you prepped the barge, what does
10 that entail?
11 A  Put equipment on it, gear, gear flats.
12 Q  What type of equipment would you put on it?
13 A  Forklift.
14 Q  And then gear or gear flats?
15 A  Gear, chains.
16 Q  Now, does the BARANOF TRADER have a set
17 schedule?
18 A  No.
19 Q  How do you know where it is in any -- at any
20 certain time?
21 A  We have a vessel -- a position report that's
22 filled out on a daily basis.
23 Q  And that vessel position report would tell
24 you where the BARANOF TRADER is?
25 A  Uh-huh.

7 (Pages 16 to 19)

Page 20

1  Q  Like, for example, if you want to know where
2  it is today, you could look at that and it would tell
3  you where it is?
4  A  Yes.
5  Q  Would it tell you where it had come from?
6  A  It would have past history.
7  Q  So you could see, let's say, for example, for
8  today it was in X, and then you look at the one
9  tomorrow, if it's in a different location, you can
10 figure out how it went from X to Y, right?
11 A  Yes.
12 Q  Does it have a general schedule, in the sense
13 that it has regular routes?
14 A  No.
15 Q  And were you -- have you worked on the
16 BARANOF TRADER before Joe Abruska's accident?
17 A  Yes.
18 Q  So you're pretty familiar with the BARANOF
19 TRADER?
20 A  Yes.
21 Q  Where are the wire railings located on the
22 BARANOF TRADER?
23    MR. WALLER: Objection. Form.
24 A  Can you repeat the question?
25 ///

Page 21

1  BY MR. SLOTTEE:
2  Q  Okay. Does the BARANOF TRADER have wire
3  railings?
4  A  Yes.
5  Q  Where are they located?
6     MR. WALLER: Objection. Form.
7  BY MR. SLOTTEE:
8  Q  You can answer.
9  A  Would you repeat the question?
10 Q  Where are the railings on the BARANOF TRADER
11 located on the barge?
12 A  On the outboard side.
13 Q  On both sides?
14 A  Yes, sir.
15 Q  Does it run the circumference of the barge?
16 A  Yes, sir.
17 Q  And how many courses of railings are there?
18 A  Two, which is the standard industry [as
19 spoken]. I believe that's what our minimum is, two.
20 Q  Have you ever seen a barge with more than two
21 railings?
22 A  No.
23 Q  Have you ever seen a barge with less than two
24 railings?
25 A  Yes.

Page 22

1  Q  What type of barge would have less than two
2  railings?
3  A  Well, some of our -- a barge that -- you have
4  one line where the tie-up bits are, there will only be
5  one safety line. That's OSHA standard, just to have
6  two lines up. And where the bits are, you can have
7  one line. Because if you have two, it hinders you
8  from tying up the barge.
9  Q  And that's an OSHA standard?
10 A  I believe so, yeah. OSHA spends a lot of
11 time on our barges.
12 Q  Are the courses of wire railings on different
13 barges approximately the same height?
14 A  Yes.
15 Q  Do you know that approximate height?
16 A  I don't remember what it is.
17 Q  Can the posts or stanchions that hold up the
18 wire railings, can they be removed?
19 A  Yes.
20 Q  Have you ever seen them removed?
21 A  Yes.
22 Q  When or why are they removed?
23 A  If we're loading in the key, which is the
24 center of the barge, we remove that safety line so
25 that we can pass containers back and forth, which is

Page 23

1  called a pass-pass operation. So the safety lines are
2  all the time taken down to move cargo back and forth,
3  put back up.
4  Q  Okay. You say that's in the center of the
5  barge?
6  A  Uh-huh.
7  Q  Do you ever take down the wire railings on
8  the ends of the barge?
9  A  No.
10 Q  Or how about further down the side of the
11 barge, so not in the center, but maybe off center?
12 A  No.
13 Q  It's always just in the center?
14 A  Uh-huh.
15    COURT REPORTER: Yes or no, please.
16 A  Yes.
17 BY MR. SLOTTEE:
18 Q  And specifically the BARANOF TRADER, have you
19 seen the wire railings on the BARANOF TRADER taken
20 down?
21 A  In the key.
22 Q  Anywhere else?
23 A  No.
24 Q  And on the date of Joseph's accident, were --
25 the wire railings in the key, were those taken down?

8 (Pages 20 to 23)

Page 24

1   A   Just in the key.
2   Q   Was that on the same side that Joseph fell
3   over on the --
4   A   Yes.
5   Q   Now, when you take down the -- remove the
6   stanchions and take down the wires, is it all a set,
7   or do you take the wires --
8   A   **You just take the wire down, you don't take**
9   **the poles down.**
10  Q   So you leave the actual poles in there, or
11  the stanchions, is that what they're called?
12  A   **They're called safety stanchions. The**
13  **stanchions are not -- there's not a safety stanchion**
14  **in the center of the key. It's 40 feet without a**
15  **stanchion.**
16  Q   So you're just taking out the --
17  A   **The wire.**
18  Q   Just kind of threading through the wire to
19  take it out?
20  A   **You're just taking them -- undoing the**
21  **turnbuckle and taking the wire down.**
22  Q   Okay. About how much distance is between two
23  safety stanchions?
24      MR. WALLER: Objection. Form.
25  A   Can you repeat the question?

Page 25

1   BY MR. SLOTTEE:
2   Q   Okay. On the BARANOF TRADER, in the key,
3   what is it? Do you know the distance between two
4   stanchions?
5   A   No, I don't.
6   Q   Could you approximate it at all?
7   A   6 feet.
8   Q   And is there a turnbuckle on either side of
9   the stanchion?
10  A   **No. At one end, it would be dead end; and on**
11  **the other end it would be turnbuckle, so you can**
12  **adjust it and tighten it.**
13  Q   Do you have to tighten the safety wires?
14  A   **All the time.**
15  Q   So you get pretty regular -- strike that.
16      You say all the time. Why would you have to
17  tighten the wire railing?
18  A   **They get knocked by freight, the wires get**
19  **knocked by tugboats assisting or hitting a dock.**
20  **Numerous scenarios why a safety line would get**
21  **loosened.**
22  Q   Okay. About how loose do they get?
23  A   **Sometimes not very loose at all. Other times**
24  **you might go in and cream a dock and take the whole**
25  **thing out.**

Page 26

1   Q   So it might just be lying on the deck?
2   A   Yeah.
3   Q   And then to tighten it up, you just tighten
4   up the turnbuckle?
5   A   Huh-uh.
6   Q   And then if you wanted to remove the wire
7   railing, you just loosen it and then pull the wire
8   railing off that way?
9   A   **Take it off. You can replace safety -- yeah.**
10  Q   And that's the same, true, for both the upper
11  and the lower wire?
12  A   Yes.
13  Q   This is a picture I'm going to mark as
14  Exhibit 2. It's one of the pictures in the inspection
15  report.
16      MR. SLOTTEE: Do you want copies of these?
17      MR. WALLER: I'll just look over his
18  shoulder.
19      MR. SLOTTEE: Okay.
20      (Exhibit No. 2 marked.)
21  BY MR. SLOTTEE:
22  Q   Here's the picture on page 3. Did I give you
23  the right one?
24  A   Uh-huh.
25  Q   And the caption of the picture says, "Showing

Page 27

1   the area on the BARANOF TRADER where Joseph Abruska
2   was working at the time of the accident."
3       Now, you didn't take this picture, right?
4   A   No.
5   Q   Do you know who did take this picture?
6   A   No.
7   Q   Does that wire railing look loose?
8   A   **Not really, but ...**
9   Q   Does it look like there's something wrong
10  with that turnbuckle?
11  A   No.
12      MR. SLOTTEE: Let's mark this as Exhibit 3.
13      (Exhibit No. 3 marked.)
14  BY MR. SLOTTEE:
15  Q   I'm giving you Exhibit 3, which is a picture
16  on page 8 of the inspection report.
17  A   Uh-huh.
18  Q   It has a caption of "Picture 3 lower safety
19  line."
20      Is that how a turnbuckle normally looks?
21  A   **Yep. Well, that's just the one end of the**
22  **turnbuckle. That's a shackle and a cable. You can**
23  **only see about 3 inches of the turnbuckle.**
24  Q   Right. Okay. So the turnbuckle is the
25  portion to the right in the picture, kind of the

9 (Pages 24 to 27)

Page 68

1  were describing before?
2  A  **This is the position report.**
3  Q  Okay. So that tells me where the BARANOF
4  TRADER was for 2003 in August, correct?
5  A  **Yes.**
6  Q  This is not the schedule that you're talking
7  about, though, right?
8  A  **No.**
9  Q  The schedule is a different document?
10 A  **Yes.**
11 Q  Does it look similar to this?
12 A  **No.**
13 Q  What does the schedule document look like? I
14 mean, does it have a line that says BARANOF TRADER?
15 A  **No.**
16 Q  What does it -- how does it differentiate
17 between barges?
18 A  **It doesn't differentiate the barges, it lists**
19 **the schedule, the sailings.**
20 Q  So it says like some barge will be going from
21 point A to point B at some -- at X date?
22 A  **Yes.**
23 Q  But it doesn't say which specific barge?
24 A  **Yes.**
25 Q  Okay. Does it say like what their cargo is

Page 69

1  going to be?
2  A  **No.**
3  Q  So, for example, for the upcoming year, for
4  2006, in the spring you'll get a schedule, and you'll
5  know that -- just picking a date -- like June 1st
6  there will be a barge going from Naknek to Dutch
7  Harbor -- just picking random places -- but it won't
8  tell you which barge is on it, which barge is actually
9  going to be doing that trip?
10 A  **Yes.**
11 Q  They just anticipate a trip will happen on
12 that date in those two locations?
13 A  **Yes.**
14 Q  Okay. So Mike Clevenger is your current
15 supervisor -- or current immediate supervisor?
16 A  **He's my immediate supervisor.**
17 Q  Was he your immediate supervisor in August of
18 2003?
19 A  **Yes.**
20 Q  Do you know who his supervisor is?
21 A  **Tom Martin.**
22 Q  And what is his position?
23 A  **President.**
24 Q  Of Northland Services?
25 A  **Yes, sir.**

Page 70

1  Q  When was the first time that you worked on
2  the BARANOF TRADER?
3  A  **I don't remember.**
4  Q  Ten years ago? Five years ago?
5  A  **Longer than that.**
6  Q  15 years ago?
7  A  **Probably, maybe.**
8  Q  Was it there when you started working for
9  Northland Services?
10 A  **Yes, sir.**
11 Q  You said you've been working for Northland
12 Services about 18 years?
13 A  **Yes, sir.**
14 Q  Do you understand the difference between
15 Northland Services and Northland Vessel Leasing
16 Company?
17    MR. WALLER: Objection to form.
18 A  **No.**
19 BY MR. SLOTTEE:
20 Q  Have you ever heard of Northland Vessel
21 Leasing Company?
22 A  **No.**
23 Q  Have you ever heard of Naknek Barge Lines?
24 A  **Yes.**
25 Q  Okay. What have you heard about Naknek Barge

Page 71

1  Lines?
2  A  **Naknek Barge Lines owns our tugs.**
3  Q  So like the POLAR BREEZE?
4  A  **They're the tugs. They're the tug company.**
5  **The POLAR BREEZE, yes.**
6  Q  To your knowledge, do they have any
7  connection with the barges? For example, do they have
8  any connection with the BARANOF TRADER?
9  A  **Not to my knowledge, I don't -- I don't know.**
10 Q  Do you know who owns Naknek Barge Lines?
11 A  **No, I don't.**
12 Q  Does the name Marine Capital Managment mean
13 anything to you?
14 A  **No.**
15 Q  Does Northland Services, to your knowledge --
16 strike that.
17    To your knowledge, who owns the BARANOF
18 TRADER?
19 A  **I don't know.**
20 Q  But Northland Services operates the BARANOF
21 TRADER?
22 A  **Yes.**
23    MR. WALLER: Objection to form.
24 BY MR. SLOTTEE:
25 Q  Northland Services determines where the

20 (Pages 68 to 71)

Page 104

1  reask the question?
2  BY MR. SLOTTEE:
3  Q   For example, the POLAR BREEZE is working on
4  the BARANOF TRADER, helping, I'll assume, move the
5  BARANOF TRADER at the time of Joseph's accident. Why
6  was the POLAR BREEZE in particular doing that? Was
7  there -- for example, did you say, We need to have the
8  POLAR BREEZE take the BARANOF TRADER from X to Y?
9  A   No.
10 Q   Did Northland Services' senior management
11 direct that?
12 A   No.
13 Q   Was that preset before in the -- you know, in
14 the proposed schedule?
15 A   No.
16 Q   If I wanted to find out what tugboats were
17 assigned to the BARANOF TRADER at any point in time,
18 is there a way I could figure that out? Would
19 Northland Services have the documents to demonstrate
20 that?
21 A   I don't know.
22 Q   Do you know anybody who would know?
23 A   Not right off the top of my head, no.
24 Q   Who do you think would know?
25     MR. WALLER: Objection. Form.

Page 105

1  A   I don't know.
2  BY MR. SLOTTEE:
3  Q   Does Northland Services have an e-mail
4  retention policy?
5  A   Have a what?
6  Q   An e-mail retention policy?
7  A   Not that I know of.
8  Q   What about any type of document retention
9  policy? Do they tell you to save certain documents?
10 A   Oh, we save our records.
11 Q   Records related to the barge, shipping
12 records?
13 A   Shipping records.
14 Q   Would there be records establishing exactly
15 when a barge went from port A to port B?
16 A   I don't know.
17 Q   Do you know who would know that?
18 A   No, I don't.
19 Q   Are your documents kept in Alaska or are they
20 sent down to Seattle?
21 A   To Seattle.
22 Q   Do you keep any documents in Alaska?
23 A   Shipping. Just -- the only thing we keep in
24 Alaska is the records of the containers, the
25 commodities.

Page 106

1      MR. WALLER: Counsel, you asked about
2  documents from point A to point B. That's Exhibit 5
3  that we just talked about.
4      THE WITNESS: I was going to let him figure
5  that out.
6  BY MR. SLOTTEE:
7  Q   What about records of who is working on a
8  particular barge at a particular time?
9  A   I don't know where you would find that. You
10 see the timecards, but the timecards are generic. We
11 just put areas. Naknek, Bethel, Dutch.
12 Q   Just like Naknek --
13 A   -- Bethel, Dutch, yeah.
14 Q   But if you -- I mean, is it typical that,
15 like, for example, in Naknek you had three Northland
16 Services [as spoken] working there on a specific date,
17 they're likely -- the likely result is that there's a
18 barge in Naknek and they're all working on that barge,
19 right?
20 A   For more -- most likely.
21 Q   Would Northland Services be doing any --
22 personnel be doing anything else? Does -- for
23 example, does Northland Services have any other
24 operations in Naknek, other than barge loading and
25 unloading?

Page 107

1  A   No.
2  Q   Now, we were talking earlier about the
3  stanchions on which the turnbuckles are connected to?
4  A   Uh-huh, yes.
5  Q   And they're just connected to an eyelet,
6  right, that's welded onto the stanchion?
7  A   Yes.
8  Q   Okay. Is there anything -- could you weld
9  another eyelet onto the stanchion. Is there anything
10 preventing that, so you could have three railings
11 going -- or three safety wires going across?
12 A   You could.
13 Q   Is there any practical reason why you
14 wouldn't want to do that?
15     MR. WALLER: Objection. Form.
16 A   Can you repeat the question?
17 BY MR. SLOTTEE:
18 Q   Well, I mean, can you think of any reason why
19 having three wires would be a negative?
20 A   No.
21 Q   Okay. And there's nothing physically
22 preventing that? Like if someone -- if a barge owner
23 said, now I want to have three wires, there's nothing
24 physically preventing them from doing that?
25 A   No.

Page 108

1  Q  Would it hinder your -- the operations of
2  loading and unloading the barge, if they were like the
3  other eyelets, in the sense that you could still
4  take -- you know, identical to the other type of
5  safety wires?
6      MR. WALLER: Objection. Form.
7  BY MR. SLOTTEE:
8  Q  Would that impinge upon any of your
9  operations?
10     MR. WALLER: Objection to form.
11 **A  Can you ask the question again, please?**
12 BY MR. SLOTTEE:
13 Q  Sure.
14    So you have the two safety wires and they're
15 connected by a turnbuckle to a stanchion. And let's
16 say you had a third one, hypothetically. So now you
17 have a stanchion with three safety wires. If they
18 could still be removed, would that impinge or would
19 that negatively affect loading or unloading the barge?
20     MR. WALLER: The same objection. Form.
21 **A  I don't know.**
22 BY MR. SLOTTEE:
23 Q  Can you think of any reason why it would?
24 **A  I don't know.**
25 Q  Can you think of any --

Page 109

1      VIDEOGRAPHER: The tape has five minutes.
2      MR. SLOTTEE: Okay. Let's quickly change
3  tapes, just to make sure I don't lose anything.
4      VIDEOGRAPHER: Off record, 3:57 p.m. This is
5  the end of Tape No. 2.
6      (Off the record.)
7      VIDEOGRAPHER: On record, 3:59 p.m. This is
8  the start of Tape No. 3 of the Bill Emory deposition.
9  BY MR. SLOTTEE:
10 Q  Okay. So what, in your opinion, is the
11 purpose of these safety wires?
12 **A  It's not my opinion; it's regulation to have**
13 **two safety wires on unmanned barges. I believe it's**
14 **an OSHA regulation.**
15 Q  Okay. And that's to prevent people from
16 falling over --
17 **A  Yes.**
18 Q  -- or to help stop them from falling over?
19    And when you're unloading and unloading [as
20 spoken], you take the safety wires down, you unhook
21 them so you can get past them, right?
22 **A  In the key only.**
23 Q  In the key only, but you don't take them down
24 anywhere else?
25 **A  No.**

Page 110

1  Q  Do you ever have to pass things in between
2  the safety wires?
3  **A  No.**
4  Q  The safety wires are relatively narrow in
5  circumference?
6  **A  Yeah.**
7  Q  Okay. So if you had a third wire railing or
8  a third safety wire in between the two that are
9  already on -- that are required by, as you said, by
10 regulation, what would that -- what effect would that
11 have on unloading and loading a barge, in your
12 opinion?
13 **A  None on loading and unloading.**
14 Q  Okay. Would it have an effect in any other
15 way?
16 **A  Yes.**
17 Q  On what, for example?
18 **A  Tying up.**
19 Q  How would that affect tying up?
20 **A  Do you see where the bit is [indicating]?**
21 Q  No. What's the bit?
22 **A  This is a tie-up bit.**
23 Q  Okay. You're referring to this orange --
24 **A  That's a tie-up bit. That's where you tie**
25 **the lines up. Regulation allows us to eliminate the**

Page 111

1  **second safety wire there, line, so we can tie up the**
2  **barge. That's the only place on any of the barges**
3  **that doesn't have a metal wire.**
4     **To put a third wire in here is going to**
5  **hinder you tying everywhere else. And it's only**
6  **required for us to have two.**
7  Q  So how would a third -- maybe I'm not
8  following. How would a third wire impinge upon you
9  tying up?
10 **A  Okay, right here [indicating], there's not**
11 **even a second wire, a middle wire, there. There's a**
12 **reason for that. That's where you tie up.**
13    **With a middle or a third wire there, you**
14 **couldn't tie the -- how would you work the line?**
15 Q  Okay, I see what you mean. You're referring
16 to this orange --
17 **A  I'm referring to the tie-up bit, the line to**
18 **tie up the barge.**
19 Q  Not these two stanchions right here?
20 **A  Those are safety stanchions, this is a tie-up**
21 **bit.**
22 Q  Okay. So if the wire was here, though, on
23 the other side, and it wasn't there, would that, in
24 your opinion, have any effect on any operations?
25 **A  No.**

30 (Pages 108 to 111)