NEIL T. O'DONNELL
CHRISTOPHER J. SLOTTEE
ATKINSON, CONWAY & GAGNON
Attorneys for Plaintiff Joseph Abruska
420 L Street, Suite 500
Anchorage, Alaska 99501-1989
Phone:  (907) 276-1700
Fax:  (907) 272-2082
nto@acglaw.com
cjs@acglaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| JOSEPH ABRUSKA, | ) | |
| | ) | Case No. 3:074-cv-209-TMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NORTHLAND VESSEL LEASING | ) | |
| COMPANY, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

All three defendants are proper defendants in this case because the Longshore

Harbor Workers' Compensation Act (LHWCA) makes no distinction between charterers

and shipowners as far as who is a "vessel."  Abruska agrees that the defendants are not liable

for the alleged (by defendants') negligence of Northland Services in its capacity as stevedore.

The defendants are liable, however, for violating their duty to turnover the Baranof Trader

in a condition that was safe for stevedoring operations. Their violation of their turnover duty is not excused by Northland Services' alleged negligence in its capacity as stevedore. At a minimum, material issues of fact exist regarding whether the defendants breached their duty to turnover the Baranof Trader in a safe condition.

## II.    <u>FACTS</u>

### A.    ABRUSKA'S ACCIDENT AND INJURIES

On August 23, 2003, Joseph Abruska fell over the side of the freight barge Baranof Trader and was crushed between the barge and the Naknek City Dock. (Ex. 1, Abruska Depo. pp. 170-71). Immediately before his fall, Abruska had been working in a long, 18-inch-wide narrow space between a row of shipping containers and the wire safety railings that run along the outer edge of the barge. (Ex. 1, Abruska Depo. p. 172; Ex. 2, Northland Inspection Report). The safety railings consisted of an upper and lower course of wire rope strung between vertical metal stanchions. (Ex. 2, Northland Inspection Report; Ex. 3, Defendants' Interrogatory Responses; Ex. 4, Emory Depo. p. 24). The safety railings in the area where Abruska fell were permanent railings in that they were not removed for cargo operations. (Ex. 4, Emory Depo. pp. 23-24, 64, 109; Ex. 5, Naekel Depo. pp. 34-35). Abruska was working immediately adjacent to the safety railing because of the confines of his work area. (Ex. 1, Abruska Depo. pp. 163-65, 170-72; Ex. 2, Northland Inspection Report). Abruska was kneeling down to attach the end of a lashing wire to a "padeye" on the deck when he lost his balance and fell between the upper safety wire and the loose lower wire. (Ex. 1, Abruska Depo. pp. 163-64, 170-72; Ex. 2, Northland Inspection Report). On

his way down, Abruska managed to grab hold of the lower wire and halt his fall to the water below. (Ex. 1, Abruska Depo. pp. 163-65, 170-71). As he held on to the wire, the vessel surged back against the dock crushing Abruska between the barge and the dock pilings. (Ex. 1, Abruska Depo. pp. 163-65, 170-71).

Abruska suffered multiple pelvic fractures and a displaced, comminuted femur fracture. (Ex. 6, Manion Depo. pp. 7-8, 24; Ex. 7, Swanson Depo. pp. 32-35; Ex. 8, Operation Report). Abruska's femur was surgically reconstructed by reaming a 38-mm metal rod through his shattered femur. (Ex. 6, Manion Depo. pp. 11-12). Abruska's multiple pelvic fractures were allowed to heal without surgical intervention. (Ex. 6, Manion Depo. pp. 24-25). Damage to nerves in the floor of Abruska's pelvis, however, produced bladder voiding problems and erectile dysfunction. (Ex. 1, Abruska Depo. pp. 18-19; Ex. 9, Clark Depo. pp. 27-28, 43-44, 61-62, 117). The urinary problems gradually resolved with medication over the course of the following year. (Ex. 9, Clark Depo. pp. 46-49, 62-63). Almost three years after the accident, however, Abruska's erectile dysfunction has still not resolved and may never resolve. (Ex. 1, Abruska Depo. pp. 15-20; Ex. 9, Clark Depo., pp. 63-66; Ex. 10, Savo Depo. pp. 21-23). Abruska, now 21 years old, must take medication, such as Cialis or Viagra, to obtain an erection. (Ex. 1, Abruska Depo. pp. 15-16, 18-19, 40; Ex. 10, Savo Depo. pp. 21-23). Sexual activity must be planned in advance as he must take medication an hour or more before sexual intercourse. (Ex. 1, Abruska Depo. pp. 18-19; Ex. 10, Savo Depo. pp. 23, 26). The medication is not always effective. (Ex. 10, Savo Depo.

p. 26).  The frequency of Abruska's intimacy with his girlfriend at the time dropped precipitately after his injuries.  (Ex. 10, Savo Depo. pp. 21-22).

Abruska may have to take erectile dysfunction medication the rest of his life. (Ex. 9, Clark Depo. pp. 63-66).  Given that erectile dysfunction medications are relatively new, it is not known whether these drugs will continue to work on a long-term basis or whether they will work as Abruska's body ages.  (Ex. 9, Clark Depo. pp. 66-68).  The side effects of the drugs are unpleasant.  (Ex. 9, Clark Depo. pp. 50-53, 55-56).  The alternatives to these drugs are not good.[1]  (Ex. 9, Clark Depo. pp. 68-70).

Abruska's erectile dysfunction condition is upsetting and embarrassing.  (Ex. 10, Savo Depo. pp. 22-23).  Abruska's leg and knee are both still painful.  (Ex. 1, Abruska Depo. pp. 26-29; Ex. 6, Manion Depo. pp. 29-30).  His orthopedic surgeon recently attempted to remove the metal rod from his femur but was unable to do so because of "heterotopic calcification," or build up of bone, in Abruska's thigh muscle.  (Ex. 6, Manion Depo. pp. 29-32).  Abruska's surgeon was able to remove the fixation screws that had been irritating tissue at the distal end of the rod.  (Ex. 6, Manion Depo. pp. 30-31).  Because of ongoing knee pain, his doctor suspects that Abruska's knee was also injured in the accident. (Ex. 6, Manion Depo. pp. 33-34).  Additional diagnostic tests are planned.  (Ex. 6, Manion Depo. p. 46).

---

[1] The alternatives include injecting a drug directly into the penis before sexual intercourse, placing a vacuum pump over the penis prior to sexual intercourse, and implanting an inflatable prosthetic into the penis.  (Ex. 9, Clark Depo. pp. 68-70).

Defendants have made much of the fact that Abruska has received benefits under the LHWCA. It is important to note that the Act does not provide **any** benefits for Abruska's pain or suffering or his apparently permanent erectile dysfunction since those conditions do not affect his wage earning capacity. The Act provides for payment of medical expenses, certain lost wages, and a lump-sum benefit (calculated as a multiple of the worker's weekly wage) for certain <u>scheduled</u> injuries, such as a lost limb or blindness. See 33 U.S.C. § 908(c). Abruska's erectile dysfunction and pain and suffering are not scheduled injuries and he has received nothing for those conditions save the cost of medical treatment.[2] Id. It also bears noting that Abruska "cannot receive a double recovery, because the stevedore, by paying him statutory compensation, acquires a lien in that amount against any recovery the longshoreman may obtain from the vessel." Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 531 n. 5 (1983).

## B. ABRUSKA'S WORK HISTORY

Defendants attempt to portray Abruska as untrained, unskilled and incompetent. Abruska, however, worked as a dock hand for the Port of Bristol Bay for most of the previous year before the accident. (Affidavit of Joseph Abruska). His responsibilities at the port included working closely with the crews that loaded and unloaded barges; operating forklifts; climbing up and down docks and shipping containers; unslinging cargo and lashing down ships that were placed in cradles on the dock. (Affidavit of Joseph

---

[2] Abruska was already entitled to free medical care as an Alaskan Native through the Indian Health Service.

Abruska; Ex. 1, Abruska Depo. pp. 43-49, 108-118, 149-150). Joseph had also previously

worked as a commercial fisherman. (Affidavit of Joseph Abruska).

### C.     ABRUSKA'S EMPLOYMENT BY NORTHLAND SERVICES

As Abruska was leaving the dock on August 23, 2003, Northland's operations

manager Bill Emory asked him if he was willing to work a few additional hours for

Northland Services loading the barge Baranof Trader. (Ex. 1, Abruska Depo. pp. 148-49;

Ex. 4, Emory Depo. p. 43). Abruska agreed to do so. (Ex. 1, Abruska Depo. pp. 148-49;

Ex. 4, Emory Depo. pp. 43-44). After Abruska was hired, he was introduced to the crew

and told to lash down the 40-foot containers. (Ex. 1, Abruska Depo. pp. 148, 150-51,

162-63). Abruska had already finished lashing down the inboard side of the containers at the

time of his fall. (Ex. 1, Abruska Depo. pp. 173-74). Although the area from which he fell

was dim, Abruska's eyes had adjusted to the conditions and he had adequate light to see the

length of the barge and do his work. (Ex. 1, Abruska Depo. p. 157). The accident occurred

several hours into his work for Northland Services. (Ex. 1, Abruska Depo. p. 149; Ex. 2,

Northland Inspection Report).

The defendants attempt to blame the accident on Northland Services' alleged

failure as an employer to adequately train Abruska. The defendants, however, fail to identify

any specific training that Abruska should have received that would have made any difference

in this accident. There is no evidence that the accident happened because Abruska

mishandled some piece of longshoring equipment or because he, or some other

longshoremen, improperly stowed equipment or cargo.  <u>See</u> (Ex. 2, Northland Inspection Report).

### D.    COAST GUARD REGULATIONS REQUIRE THREE COURSES OF RAILINGS

Coast Guard regulation 46 C.F.R. § 92.25-5(a) requires unmanned barges over 15 gross tons that were built after July 1, 1969, such as the Baranof Trader, to have three courses of railings no more than 15 inches apart.  46 C.F.R. §92.25-5(a).  There is no dispute that the Baranof Trader had only two courses of railings and that those two courses of railings – when properly taut – were 17½ inches apart.  (Ex. 3, Defendants' Interrogatory Answers).

Abruska previously moved for summary judgment on Defendants' failure to comply with 46 C.F.R. § 92.25-5.  <u>See</u> (Docket 8, 10).  Defendants argued in opposition that the Coast Guard's Marine Safety Manual (which does not have the force of law) exempted barges such as the Baranof Trader from the express requirements of 46 C.F.R. § 92.25-5(a). <u>See</u> (Docket 9).  Although Judge Singleton found the issue to be "close," he denied Abruska's motion.  (Ex. 11, Singleton Order, p. 5).  The Court found that while 46 C.F.R. § 92.25-5 applied to the Baranof Trader, the regulations permitted the United States Coast Guard to exempt unmanned tank barges from the requirements of 46 C.F.R. § 92.25-5 if installation of a third course of railings would be "unreasonable and impracticable."  (<u>Id.</u> at 6).  The court stated "[w]hat Abruska has failed to show is that installation of a third rail was reasonable and practicable in light of the BARANOF TRADER's use and design."  (<u>Id.</u> at 7-8).

As shown in Abruska's concurrently-pending Renewed Motion for Summary Judgment, discovery in this case has established that the installation of a third course of railings would not be "unreasonable and impracticable." See (Docket 33). Indeed, adding a third railing would simply involve welding attachment points to the already existing vertical stanchions and running wire (similar to the two existing wires) between those new attachment points. (Ex. 5, Naekel Depo. pp. 62-63). Northland's operations manager, Bill Emory, an individual who has worked on the Baranof Trader "countless" times and on other barges for 18 years, admitted that there was no physical or practical reason to not have three wire railings. (Ex. 4, Emory Depo. pp. 18, 70, 107). Having three wire railings would have no impact on loading and unloading operations. (Ex. 4, Emory Depo. pp. 107, 109-111). See also (Ex. 5, Naekel Depo. pp. 51).[3] The railings in the area where Abruska fell are left permanently in place and are not removed for cargo operations. (Ex. 4, Emory Depo. pp. 23-24, 64, 109; Ex. 5, Naekel Depo. pp. 34-35).

Even the defenses' expert admits that having three courses of railings was "feasible," that having a third railing would lessen the chance of falling, and that there was nothing physically precluding the installation of a third railing on a barge such as the Baranof Trader. (Ex. 5, Naekel Depo. pp. 51-52, 61-63) Installation of a third wire railing would not be "unreasonable and impracticable." (Ex. 4, Emory Depo. pp. 107, 109-111; Ex. 5, Naekel Depo. pp. 51-52, 61-63).

---

[3] The defense expert Leo Naekel worked on a barge with three safety wires. The third safety wire did not interfere with loading or unloading the barge or any other barge operations. (Ex. 5, Naekel Depo. pp. 51-52).

###### E.     THE LOWER WIRE SAFETY RAILING WAS LOOSE

In addition to the lack of a third safety wire, the lower wire in the area where Abruska fell was loose.  (Ex. 2, Northland Inspection Report; Donkersloot Depo. pp. 30-31).  Abruska fell over the loose lower wire and under the upper wire.  (Ex. 1, Abruska Depo. pp. 163-64, 170-72; Ex. 2, Northland Inspection Report).

It is reasonable to infer that the lower wire was loose when the vessel was "turned over" to Northland Services in its capacity as stevedore upon arriving in Naknek 16 to 18 hours before the accident.  (Mem. p. 1).  Northland Services' dock and barge master Luke Donkersloot testified that  "everybody was aware" of the loose lower safety wire in the area where Joseph fell.   (Ex. 12, Donkersloot Depo. pp. 30-31).  No one has identified any impact or other event which would have caused the wire to become loose after the vessel arrived in Naknek only 16 to 18 hours before the accident.  See (Mem. p. 2).  Safety wires can be knocked loose as barges are moved from dock to dock.  (Ex. 5, Naekel Depo. p. 99).  Given the relatively short time between when the Baranof Trader arrived in Naknek and when Abruska was injured, a reasonable inference is that the lower safety wire was loose when the Baranof Trader arrived in Naknek and was "turned over" to Northland Services in its capacity as stevedore.   See, e.g., Motley v. Parks, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (in the context of a summary judgment motion, the court must view all facts and draw all reasonable inferences in favor of the nonmoving party).

---

Furthermore, after Abruska's fall, Northland investigated the incident. (Ex. 2, Northland Inspection Report). Northland Services' safety officer, Ben Burns, interviewed Abruska, Northland Services' operations manager Bill Emory, and dock and barge master Luke Donkersloot. (Id.) Burns also examined photographs of the area where Joseph fell. (Id.) The investigation found that Abruska was working in a restricted space approximately 18 inches wide when he slipped "and fell **through** the wire safety lines." (Id. at 2) (emphasis added). The investigation determined that "[t]he lower safety line, although connected to vertical stanchions, **was loose and did not provide an effective barrier**." (Id. at 4) (emphasis added).

The investigation found that while there were several factors that contributed to the accident, there were only two "major contributing factors." (Id. at 5) (emphasis in original). One was Joseph's inexperience. The other "major contributing factor" was the loose safety wire. (Id.) The report states that:

> **Safety Lines –** Inadequate and improperly secured safety lines (See Picture 1 and Picture 3) this is considered to be a major contributing factor. Joseph was able to fall through the safety lines due to the lower line being slack.

(Id.) (emphasis in original). The report also recommended several corrective actions. These included "[a]ll barges to be checked to make sure safety lines are adequate." (Id. at 6). Thus, substantial evidence indicates that the lower safety wire was loose; that the lower safety wire did not provide an effective barrier; and that the loose lower safety wire was a "major contributing factor" of Abruska's accident.

### III.   ARGUMENT

**A.   SUMMARY JUDGMENT STANDARDS**

The moving party has the burden of showing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party does not meet that burden the motion must be denied. Id. It is only if the moving party has met its burden of proof that the non-moving party must come forward with evidence showing a genuine issue of fact. Deveraux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

"Summary judgment is rarely granted in negligence cases. Whether the defendant acted reasonably is ordinarily a question of fact." Martinez v. Korea Shipping Corp., 903 F.2d 606, 609 (9th Cir. 1990) (reversing grant of summary judgment to vessel owner on longshoreworker's 905(b) claim and remanding for trial). See also Thomas v. Newton International Enterprises, 42 F.3d 1266, 1269 (9th Cir. 1994) (same). In Ingersoll v. Newport Petroleum, Inc., 2004 WL 3363407 p. 2 (D. Alaska 2004), Judge Sedwick denied the longshoreworker's motion for summary judgment noting that "summary judgment is rarely granted in cases involving claims of negligence" and concluding that "the question of whether ice coverage over one-quarter of Barge 255's deck constitutes an unreasonably dangerous condition to an expert and experienced stevedore is disputed." Id.

Furthermore, "[a]s with the issue of breach, proximate cause is usually a factual decision that should be decided at trial.  As explained in another maritime case, proximate cause is a means of cutting off liability for consequences that are so far removed from the conduct at issue that there is no justification for imposing liability."  Christensen v. Georgia-Pacific Corp., 279 F.3d 807, 815-16 (9th Cir. 2002).  "Proximate cause is causation substantial enough and close enough to the harm to be recognized by law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm."  Sosa v. Alvarez-Machain, 542 U.S. 692, 704 (2004).

### B.    NORTHLAND VESSEL LEASING COMPANY IS A PROPER DEFENDANT

The fact that Northland Vessel Leasing demise chartered the Baranof Trader to Naknek Barge Lines does not insulate Northland Vessel Leasing from liability.  First, the case relied upon by the defendants, Kerr-McGee Corp. v. Law, 479 F.2d 61 (4th Cir. 1973), does not address a § 905(b) claim under the LHWCA.  Id. at 62.  It concerns a claim against a vessel for damage to the vessel's cargo.  Id.  The LHWCA has a specific statutory provision permitting claims against "vessels."  33 U.S.C. § 905(b).  The LHWCA broadly defines "vessels" to include the vessel's "owner, owner pro hac vice, agent, operator, **charter or bare boat charterer**, master, officer, or crew member."  33 U.S.C. § 902(21) (emphasis added).  The Ninth Circuit has noted that its cases "make no distinction between charterers and shipowners as far as who is a 'vessel' under the LHWCA."  Rodriguez v. Bowhead Transportation Co., 270 F.3d 1283, 1286 (9th Cir. 2001).  The fact that Northland Vessel Leasing demise chartered the Baranof Trader is of no legal significance.

Second, even if the existence of the demise charter was legally significant, Northland Vessel Leasing would still be liable for any defects present on the vessel before it was chartered. Although defendants quote that portion of <u>Kerr-McGee</u> holding that when an owner enters in a demise charter it is no longer charged with the duties and liabilities of an owner, the defendants ignore <u>Kerr-McGee's</u> further holding that "the owner of vessel under a demise charter is liable only for unseaworthiness or negligence that **pre-exists the charter**." <u>Kerr-McGee Corp. v. Law</u>, 479 F.2d at 63 (emphasis added).

The Baranof Trader's lack of three courses of railings was negligent *per se*. <u>See</u> Section II.D. <u>See</u> <u>also</u> (Docket 33). The defendants do not dispute that the Baranof Trader always had two courses of wire railings. Thus, the negligence "pre-exists the charter" and Northland Vessel Leasing is liable even if the Court accepts the applicability of <u>Kerr-McGee</u> in a LHWCA case.

### C.    NAKNEK BARGE LINES, LLC, IS A PROPER DEFENDANT

The defendants acknowledge that Naknek Barge Lines, LLC, is a responsible vessel owner for purposes of Abruska's 905(b) claim. (Mem. p. 16).

### D.    NORTHLAND SERVICES, INC., IS A PROPER DEFENDANT

Abruska agrees with the defendants that Northland Services may only be sued in its capacity as vessel owner. Conversely, it is important to note that the rights of an injured longshoreman are not in any way diminished on account of his employer's status as vessel owner. The House Committee report accompanying the legislation that revised the LHWCA in 1972 stated that "the rights of an injured longshoreman . . . should not depend

on whether he was employed directly by the vessel or an independent contractor.  . . .  The

Committee's intent is that the same principles should apply in determining liability of the

vessel which employs its own longshoremen . . . as apply when an independent contractor

employs such persons." Gravatt v. City of New York, 226 F.3d 108, 118-19 (2nd Cir. 200)

(quoting H.R. Report No. 92-1441, 1972 U.S.C.C.A.N. at 4705).

      The fact that a dual-capacity employer may be sued by a longshoreman in its

capacity as vessel owner was conclusively resolved in Jones & Laughlin Steel Corp. v. Pfeifer,

462 U.S. 523 (1983).  In that case, "while carrying a heavy pump, respondent slipped and fell

on snow and ice that petitioner had negligently failed to remove from the gunnels of a

barge." Id. at 526.  The court concluded that "if respondent had been employed by an

independent stevedore at the time of his injury, he would have had the right to maintain a

tort action against the vessel. We hold today that he has the same right even though he was

in fact employed by the vessel." Id. at 532.  Northland Services, as time charterer of the

vessel Baranof Trader, is liable for any negligence attributable to it as a vessel owner.

Rodriquez v. Bowhead Transp. Corp., 270 F.3d 1283, 1286 (9th Cir. 2001).

      The defendants state that, "under Ninth Circuit precedent, a time charterer

may also, under limited circumstances, be held liable under § 905(b) as a vessel owner."

(Mem. p. 17) (emphasis added).  If this statement is meant to imply that a time charterer has

any lesser duties than an entity that both owns and operates a vessel, or whose status is that

of an owner *pro hac vice*, this statement is incorrect.  In Rodriquez, the Ninth Circuit stated:

> Section 905(b) of the LHWCA permits an injured worker to sue
> "vessels" for negligence, even if the worker has already received

> workers' compensation for injuries. [citations omitted]   Our cases make **no distinction** between charterers and ship owners as far as who is a "vessel" under the LHWCA. [citations omitted]  Bowhead, as a time charterer, is a "vessel" for the purposes of § 905(b), and Rodriquez may bring a negligence suit against the company.

(<u>Id.</u> at 1286) (emphasis added.)[4]

**E.     ABRUSKA IS NOT PURSUING CLAIMS FOR "ACTIVE CONTROL" OR BREACH OF THE "DUTY TO INTERVENE"**

The defendants address a portion of their brief to arguments that they did not breach their <u>Scindia</u> duties of active control or duty to intervene.  Abruska, however, is not pursuing claims for breach of these duties.

**F.     THE DEFENDANTS ARE LIABLE FOR VIOLATION OF THE TURNOVER DUTY OF SAFE CONDITION**

The "turnover duty" relates "to the condition of the ship **upon commencement** of stevedoring operations."  <u>Howlett v. Birkdale Shipping Co., S.A.</u>, 512 U.S. 92, 98 (1994) (emphasis added).  This duty "extends **at least** to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property."  <u>Scindia Steam</u>

---

[4] The defendants point out that the court in <u>Bowhead</u> exonerated the time charterer. The court exonerated the time charterer because "there was no indication that the injury was caused by the barge's gear."  Rather, the injury was caused when a co-worker set down a 20,000 pound fork lift load on Rodriquez' foot.  <u>Id.</u> at 1285, 87.

Navigation, Co. v. De Los Santos, 451 U.S. 156, 167 (1981) (emphasis added). See also

Martinez v. Korea Shipping Corp., 903 F.2d 606, 608 (9th Cir. 1990); Thomas v. Newton

International Enterprises, 42 F.3d 1266, 1269 (9th Cir. 1994).

        Where a defendant acts in a dual capacity as both vessel owner and employer,

the court may have to divide the employer shipowner into a hypothetical independent

employer and independent vessel owner. Gravatt v. City of New York, 226 F.3d 108, 124

(2nd Cir. 2000). If the defendant's negligence "is in its vessel capacity, it is liable to its

employee in tort under section 905(b) to the same extent as a third-party vessel would be

liable to the injured employee of an independent employer injured as the result of the third-

party vessel's negligence." Id. at 133. If instead, "the injury was caused by the negligence of

persons engaged in providing stevedoring services to the vessel," the employer is relieved of

liability. 33 U.S.C.§ 905(b). Thus, the Scindia turnover duty applies to each of the

defendants as a vessel owner, regardless of whether they were also Abruska's employer.

        Here Abruska was not injured "by the negligence of persons engaged in

providing stevedoring services to the vessel," but rather by the pre-existing condition of the

railing: the lack of a third course of railing and the loose lower railing. Under Scindia, the

Baranof Trader's owners were responsible for turning over the vessel in a condition that was

safe for experienced longshoreman. Scindia, 451 U.S. at 167. The deficient and defective

railings were part of the vessel. They were permanently affixed to the vessel. They pre-

existed the start of cargo operations. They were not removed during cargo operations. The

defendants negligently failed to turn over the vessel to Northland Services in its stevedoring capacity in a safe condition.

Gravatt, the Second Circuit case cited by defendants, illustrates the distinction between vessel and stevedoring negligence. Gravatt's fellow employees improperly loaded heavy construction debris on top of new construction material; failed to use the proper lifting equipment when moving the debris out of the way to get to the new material; and gave improper hand signals to the crane operator who could not see the debris area and could not tell that Gravatt was not yet clear of the area. These acts of negligence resulted in the debris falling and injuring Gravatt. Gravatt, 226 F.3d at 113. This conduct was deemed employer rather than vessel negligence. Id. at 114.

The Second Circuit distinguished the facts in Gravatt from the facts in its prior decision in Smith v. Eastern Seaboard Pile Driving, Inc., 604 F.2d 789 (2nd. Cir. 1979). Gravatt, 226 F.3d at 129. In Smith, the plaintiff's deceased husband:

> was employed by defendant as a diver to inspect underwater damage to a dredge, owned by the defendant. He worked off a tug which was also owned by the defendant. When he jumped into the water, the heavy equipment he wore overturned him, putting him in distress. The efforts of the tug personnel to right him, buoy him and haul him from the water were unsuccessful and he drowned. The jury at trial determined that the defendant was negligent by reason of the tug's failure to have (i) an emergency plan, (ii) a rescue line, life ring or life raft, and (iii) a ladder to facilitate reboarding. The district court, however, entered judgment for the defendant because it held that the negligence was that of tug employees who, like the decedent, were involved in the provision of repair services.

Id. at 129.[5]  The Second Circuit reversed the District Court's holding and reinstated the

jury's verdict.  The Court in Gravatt stated, quoting from its earlier decision in Smith, that:

> [t]he acts and omissions found to constitute actionable
> negligence all took place prior to the actual dive and were **akin
> to a failure to provide a safe place to work**.  The absence of a
> rescue plan, the improper placement of emergency apparatus,
> and the failure to provide a ladder or platform were all defects
> **in the general operation of the tug,** and it is merely fortuitous
> that they came to light during a dive that was part of a repair
> program.

Gravatt, 226 F.3d at 129 (quoting Smith, 604 F.2d at 796) (footnotes omitted) (emphasis

added).  Thus the Court stated that the result in Smith differed from the result in Gravatt

because "the negligence [in Smith] was found to be in the vessel capacity because it consisted

of the failure to equip the tug properly for emergencies."  Gravatt, 226 F.3d at 129.

The deficiencies in the railings undoubtedly existed when the vessel was

"turned over" to Northland Services in its capacity as stevedore only 16 to 18 hours prior to

the accident.  The deficient railings here clearly implicate the defendants' role as vessel

owners.

### G.    THE DEFENDANTS VIOLATED THEIR TURNOVER DUTY BY FAILING TO HAVE THREE COURSES OF RAILINGS

The defendants argue that whether the Baranof Trader violated 46 C.F.R.

§ 92.25-5(a) by not having three courses of railings has no bearing on whether they violated

their duties as vessel owner. (Mem. p. 20).  According to the defendants, these Coast Guard

---

[5] At the time of Smith's injury, shipworkers and repairers, like longshoreman, were entitled to sue their dual-capacity employer for negligence as vessel owner but not as shipbuilder or repairer.

regulations simply protect seamen ("wards of the Court," and now apparently "wards of the Coast Guard") and have nothing to do with longshoreworkers because longshoremen are so expert, skilled and highly trained.  (<u>Id.</u>)  Not only that, according to defendants, but OSHA regulations do not apply to longshoremen either, again because longshoreworkers are so expert, skilled and highly trained.  (<u>Id.</u> at 19).  Thus longshoreworkers are so expert, skilled and highly trained that, according to defendants, neither Coast Guard nor OSHA regulations are relevant to determining the vessel owners' duty of care to such highly skilled individuals. The defendants' argument reflects what happens when someone takes a broad, general proposition and forces it to a an absurd end.

The defendants primarily rely on <u>Haines v. Honolulu Shipyard, Inc</u>., 125 F. Supp. 2d 1020, 1028 (D. Hawaii).  The defendants quote the court's statement that "although OSHA regulations may set forth various safety requirements, they neither define nor discuss what designs or conditions are safe or unsafe for a skilled worker exercising reasonable care."  (Mem. p. 20).  This conclusion is unsupported by case law, unreasonable, and contrary to Ninth Circuit authority.

In <u>Martinez v. Korea Shipping Corp., Ltd</u>., 903 F.2d 606, 611 (9th Cir. 1990), the court found that OSHA standards requiring <u>the stevedore company</u> to place guardrails around deck openings were relevant in determining whether <u>the vessel owner</u> had violated its duty of care to the longshoreworkers aboard the vessel.  The court stated:

> [I]n Ollestad [v. Greenville Steamship Corp., 738 F.2d 1049 (9th Cir. 1984), cert. denied, 469 U.S. 1197 (1985)], this court held that it is proper for a jury to consider Occupational Safety and Health Administration (OSHA) Regulations in deciding whether the vessel's condition created an unreasonable risk of harm to the workers. [citation omitted] Although OSHA standards only impose a duty on stevedores, this court has held that it is not an exclusive duty.

Id. at 611. Since OSHA regulations applicable only to the stevedore company are relevant in determining the vessel owner's standard of care, Coast Guard regulations that **directly apply to the vessel owner** must be relevant in determining the vessel owner's standard of care.

This conclusion is further manifest when considering the results of the defendants' proposed rule. According to the defendants, the required three courses of railings are only intended to protect one group of individuals who board the vessel, but not another, from falling overboard. This is so, according to the defendants, even though the railings in question are permanent railings and are not removed during stevedoring operations. (Ex. 4, Emory Depo. pp. 23-24, 64, 109; Ex. 5, Naekel Depo. pp. 34-35). This is so, according to the defendants, even though it is impossible for the owner to comply with the Coast Guard regulations without also providing the same level of safety to other workers aboard the vessel. This is so, according to the defendants, even though there is no evidence that there is something unique about an "expert and experienced" longshoreman such that two courses of railings would provide the same level of protection as three courses of

railings. The result proposed by defendants, in addition to being completely incomprehensible to someone who is not a lawyer, is simply contrary to Ninth Circuit law.[6]

Even the defendants' own expert recognizes that wire railings on a barge are necessary, regardless of who or what is on the barge. (Ex. 5, Naekel Depo. p. 71). They are necessary because "you need to have restraint from falling over that edge" of the barge. (Ex. 5, Naekel Depo. p. 73). Indeed, Mr. Naekel acknowledges that safety measures on a barge should protect all longshoremen on a barge, regardless of their level of experience. (Ex. 5, Naekel Depo. p. 27).

Since 46 CFR § 92.25-5's requirement that barges such as the Baranof Trader have three courses of railings applies to vessel owners, and since Abruska is suing defendants in their capacity as vessel owners, the violation of 46 C.F.R.§ 92.25-5 is relevant, and indeed controlling, in determining the applicable standard of care.[7] Restatement (Second) of Torts § 288B (violation of regulation is "conclusive on the issue of an actor's negligence").

---

[6] See also Duty v. East Coast Tender Service, Inc., 660 F.2d 933 (4th Cir. 1981), where Coast Guard regulations were held relevant to determining the vessel owner's standard of care in a longshoreworker's 905(b) claim. In fact, the en banc court held it was reversible error for the District Court to have only instructed the jury that operation of the vessel in violation of Coast Guard licensing regulations was evidence of negligence instead of negligence per se. Id. at 947.

[7] Abruska agrees with the defendants that OSHA regulations do not address the construction of the perimeter safety railing on barges such as the Baranof Trader, or perimeter railings at all, except to say that "removable weather deck rails shall be kept in place except when cargo operations require them to be removed, in which case they shall be replaced as soon as such cargo operations are completed." 29 CFR § 1918.36. (Mem. p. 20). The railings where Abruska fell are not removed for cargo operations. (Ex. 4, Emory Depo. pp. 23-24, 64, 109; Ex. 5, Naekel Depo. pp. 34-35).

**H.    WHETHER THE "TWO-WIRE" SAFETY RAIL SYSTEM IS THE INDUSTRY STANDARD IS NOT CONTROLLING, NOR IS THE ALLEGED ABSENCE OF PRIOR ACCIDENTS, NOR IS THE ALLEGED "OPEN AND OBVIOUS" NATURE OF THE CONDITION**

It is certainly practical and feasible to install a third safety wire.  (Ex. 4, Emory Depo. pp. 107, 109-111; Ex. 5, Naekel Depo. pp. 51-52, 61-63).  Other vessels have a three-wire system.  (Ex. 4, Naekel Depo. pp. 51-52).  The fact that most vessels allegedly have a two-wire system is not controlling for purpose of determining the reasonableness of the defendants' conduct – nor is the alleged absence of prior accidents, or the "open and obvious" nature of the two courses of railings.

In <u>Martinez v. Korea Shipping Corp.</u>, 903 F.2d 606, 609-10 (9th Cir. 1990), the vessel owner argued that the longshoreworker's 905(b) claim should be dismissed because the absence of a guard rail around a ladder opening "is standard in the industry and meets international requirements.  KSC also offered evidence that during the vessel's seven years of operation no longshoreman ever fell into one of the ladder openings." <u>Id.</u> at 609. The Ninth Circuit, however, held that:

> An accident that is unprecedented or extraordinary is not necessarily reasonable.  [citations omitted]  Likewise, proof of adherence to an industry practice or custom is not dispositive on the issue of negligence.  [citations omitted]  The fact that the ladder opening was obvious to Martinez and other longshoremen working on board the vessel, moreover, does not necessarily preclude a finding of ship owner negligence. . . . Under <u>Scindia</u>, the obviousness of the defect does not absolve the vessel owner of its duty to turn over the ship in a condition under which expert and experienced stevedores can operate safely. . . .  In this case, we believe that reasonable jurors could differ on whether the ladder opening, although obvious,

> presented an unreasonably dangerous work environment to
> experienced longshoreman exercising reasonable care.

Id. at 610.  See also Ludwig v. Pan Ocean Shipping Co., Ltd., 941 F.2d 849, 851 (9th Cir.

1991) ("The obviousness of the hazard . . . is not dispositive of the question whether

PanOcean breached its turnover duty of safe condition.").[8]

## I.    TURNING OVER THE VESSEL WITH A LOOSE LOWER SAFETY RAILING WAS NEGLIGENT

For purposes of the defendants' summary judgment motion, it must be

assumed that the lower course of railing was loose in the area where Abruska was working.

Motley v. Parks, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (in the context of a summary

judgment motion, the court must view all facts and draw all reasonable inferences in favor of

the nonmoving party).  This is not a difficult assumption since longshoreworker Luke

Donkersloot testified the lower course of railing was loose and Northland Services itself

determined that it was loose after the accident and further determined that this condition

was "a major contributing cause" of the accident.  (Ex. 12, Donkersloot Depo. pp. 30-31;

Ex. 2, Northland Investigation Report).

---

[8] Defendants cite Bandeen v. United Carriers (Panama), Inc., 712 F.2d 1336 (9th Cir. 1983), for the proposition that "the statutory scheme now places the duty of providing safety appliances upon the stevedore." (Mem. p. 27).  The issue in Bandeen was whether the vessel had to provide certain safety wires during log loading operations that were not already part of the ship and were not normally used in such operations.  Id. at 1338.  The court answered that question in the negative.  In the subsequent Martinez case, the Ninth Circuit noted that Bandeen "did not hold that the duty to take safety precautions fell exclusively on the stevedore to prevent accidents caused by design defects."  Martinez, 903 F.2d at 610.  Here the lack of a third course of railing is, like in Martinez, a type of design defect.  Further, the third course of railing is required by 46 C.F.R.§ 92.25-5(a).  Clearly the vessel owner had a duty to turnover safety gear that is already part of the vessel in proper condition.

The importance of having a taut (instead of a loose) safety railing is obvious. The importance of having taut safety railing is all the more important where the railing consists of only two, instead of three, courses of wire. The importance of taut wires was such that Northland Services claims it made it a standard practice to inspect safety railings at the start of stevedoring activities. (Ex. 4, Emory Depo. p. 32). The importance of taut wires is demonstrated by the fact that after Abruska's accident, Northland Services recommended that all safety railings on its barges be inspected. (Ex. 2, Northland Inspection Report). Finally, the importance of taut railings is confirmed by Northland Services' accident report which determined that the loose railing was a "major contributing cause" of Abruska's accident.[9] (Id.) (emphasis in original).

"Where the shipowner itself supplies equipment, it has a duty to inspect the equipment before turning it over for use by the stevedore." Hedrick v. Daiko Shoji Co., Ltd, Osaka, 715 F.2d 1355, 1357 (9th Cir. 1983). According to the defendants, they made no inspection of the vessel before it was turned over to Northland Services in its capacity as

---

[9] The longshoreworker does not have to show that the precise manner or chain of events that led to the injury was foreseeable, but simply that the condition generally created a risk of harm. Serbin v. Bora Corp., Ltd., 96 F.3d 66, 72-73 (3rd Cir. 1996).

stevedore.[10] Therefore, it is "a jury question whether an inspection would have revealed the [loose safety railing], and whether the shipowner's breach of its duty to inspect its own equipment was therefore a proximate cause of the accident." Id.[11]

Assuming, contrary to the defendants' assertion, that an inspection was made in defendants' role as vessel owners, then (given the evidence and inferences that must be drawn at this stage of the proceedings), that inspection was negligent in not identifying and/or correcting the loose lower railing. Motley, 432 F.3d at 1075 n.1. As the defendants admit, the loose lower railing was a "major contributing cause" of Abruska's accident and should have been repaired. (Ex. 2, Northland Inspection Report).

Additional cases illustrate the inappropriateness of granting summary judgment on the question of the defendants' failure to identify and/or repair the loose lower safety wire. In Gilstrap v. Lakhi Maritime, Inc., 2005 WL 1113839 (D. Oregon 2005), the longshoreworker twisted his ankle on a loose metal grating. The longshoreworker alleged a breach of the owner's turnover duty stating:

---

[10] The only individuals who allegedly inspected the railings prior to the stevedoring operations in Naknek were Northland Services employees Bill Emory and Luke Donkersloot. (Mem. pp. 2, 24). After separating Northland Services into its hypothetical "vessel owner" and "stevedoring" capacities, the defendants state that "Northland Services, as time charterer, had no knowledge of the conditions aboard the barge. It had no personnel at the dock and was not engaged in any vessel operations. [citation omitted] All Northland Services personnel in Alaska were employed and working in their stevedore or longshore capacities." (Mem. p. 28) (emphasis added). Accepting this assertion, the defendants failed to make any inspection of the Baranof Trader in their capacity as vessel owners prior to "turning over" the vessel to Northland Services in its capacity as stevedore.

[11] Hedrick involved the failure of the vessel owner to identify a manufacturing defect in a wire rope splice before it gave way.

> the shipowner knew or should have known that the grating was
> not secured to its supporting structure and that there was no lip
> at the end of the supporting structure to prevent the grating
> from sliding off the structure, and that this was an unsafe
> practice, in violation of the International Safety Management
> Code.  In addition, Gilstrap contends that the gratings had slid
> previously in this area and the shipowner had to be aware of
> this based on the worn and scratched paint on the structure.

Id. at 2.  The court denied the vessel owner's motion for summary judgment finding material

issues of disputed fact.  Id. at 3.

The Oregon District Court also denied the vessel owner's motion for

summary judgment in an earlier turnover duty/"sliding metal grate" case.  Gonnuscio v.

Seabrand Shipping Ltd., 968 F. Supp. 524 (D. Oregon 1997).  In that case the stevedore

supervisor prepared an accident report, which was then signed by the the vessel's chief

officer, stating that a "defective weld on grating over vessel on deck piping resulting in

above [accident] report."  Id. at 528.  The court concluded there were material issues of

disputed fact.  Id. at 530.

In Prinski v. Blue Star Line Marine Ltd., 341 F. Supp. 2d 511 (E.D. Pa. 2004),

the plaintiff longshoreworker sustained injuries when he hit his head on one of the vessel's

archways.  Id. at 514.  The court denied the vessel owner's summary judgment motion,

stating "a fact-finder could reasonably conclude that the inconsistent heights among the

archways and within the structure of the archway created a dangerous condition.  A

fact-finder could reasonably conclude that Blue Star Line should have inspected the ship for

hazards such as this one in its exercise of reasonable care, and that because it failed to

discover or address this hazard, it turned over the vessel in a dangerous condition." Id. at 518.

In Lincoln v. Reksten Management, 354 F.3d 262 (4th Cir. 2003), the longshoreworker sustained injures when his foot went through rotten wooden deck boards and sued for breach of the vessel's turnover duty.  The Fourth Circuit reversed a grant of summary judgment to the vessel owner, stating that "taking the present evidence most favorably for Lincoln, the vessel might have been negligent in the maintenance, upkeep, and especially the inspection of the deck in question, so that, in the exercise of reasonable care, it might have discovered the defect or hole in the decking into which Lincoln fell . . ." Id. at 268.

Under the above authorities and the facts of this case, a material issue of fact exits regarding whether the defendants were negligent in failing to inspect and/or repair the loose wire railing prior to "turning over" the vessel to Northland Services in its capacity as a stevedore in Naknek.

**J.    THE LACK OF THREE WIRE RAILINGS AND THE LOOSE LOWER WIRE RAILING POSED AN UNREASONABLE RISK TO ALL INDIVIDUALS WORKING ON THE VESSEL**

The defendants also seek to avoid liability by claiming that the lack of three courses of railings and the loose lower railing did not pose an unreasonable risk to longshoremen working on the vessel.  In support of this argument, the defendants cite to the opinion of Mr. Naekel.

Mr. Naekel states that the two courses of railings are the industry standard and do not pose an unreasonable risk. (Ex. A to Affidavit of Leo Naekel). As discussed above, however, and in Abruska's Renewed Motion for Summary Judgment, Coast Guard regulations required three courses of railings. See supra Section D. See also (Docket 33). If the Baranof Trader violated Coast Guard regulations by having only two courses of railings, the defendants are negligent *per se*. See, e.g., Restatement (Second) of Torts § 288B; Duty, 660 F.2d at 947.

Second, Mr. Naekel offers no opinion on whether the loose lower railing posed a danger to longshoremen. (Ex. A to Affidavit of Leo Naekel). Mr. Naekel has no opinion on how loose the lower wire was. (Ex. A to Affidavit of Leo Naekel). Mr. Naekel has no opinion on how Abruska's accident happened. (Ex. 5, Naekel Depo. p. 76). Mr. Naekel admits that a taut wire railing would be more effective in stopping someone from falling over. (Ex. 5, Naekel Depo. p. 50). Common sense also dictates that a loose wire railing has less restraining capacity than a taut railing.[12] Furthermore, the defendants have not taken issue with the conclusion of the investigation report that the loose lower railing was a "major contributing cause" of Abruska's accident. (Ex. 2, Northland Inspection Report) (emphasis in original). Even if the defendants had taken issue with this conclusion

---

[12] The question of whether a loose wire railing poses an unreasonable risk is not a question that requires expert testimony. It is an issue within the common knowledge of the factfinder. See, e.g., U.S. v. Finley, 301 F.3d 1000, 1007 (9th 2002) (expert testimony not necessary or admissible on issues within the common knowledge of the factfinder).

through the submission of conflicting admissible evidence, the defendants would at most have established a disputed issue of material fact.

Consequently, the defendants cannot avoid liability by claiming that the loose lower railing did not present a danger to "expert and experienced" longshoremen. The defendants have not presented any evidence that experienced longshoremen will never lose their balance and need a safety railing. Such an argument, if presented and accepted, would allow a vessel owner to turnover a vessel with no working safety equipment, an absurd result. See Smith v. Eastern Seaboard Pile Driving, 604 F.2d 789, 796 (2nd Cir. 1979) (vessel negligent for lack of rescue plan and emergency apparatus); Martinez v. Korean Shipping Corp., 903 F.2d 606, 610 (9th Cir. 1990) (jury entitled to determine whether absence of guard rail around ladder opening was negligent). Taking reasonable inferences from the evidence in Abruska's favor, there is certainly a question of fact whether the presence of a loose lower railing posed an unreasonable risk to longshoremen working on the Baranof Trader.

### K. THE DEFENDANTS' VESSEL NEGLIGENCE IS NOT EXCUSED BY NORTHLAND SERVICES' ALLEGED STEVEDORING NEGLIGENCE

The defendants magnanimously state that if a loose lower railing caused or contributed to the accident, then Northland Services was indeed at fault – but only as a stevedore and not a vessel owner. The defendants state "to the extent Abruska believes (accurately or not) that portions of the perimeter wire were too loose, he necessarily must recognize that his own Northland Services' supervisors failed to identify or correct the situation." (Mem. p. 24) This argument is based on a misconception of applicable law.

The fact that the defendants assert that Northland Services had a duty as stevedore to inspect and fix loose railings does not eliminate the pre-existing duty of the defendants to "turnover" a safe vessel.  As pointed out by the Second Circuit in the <u>Gravatt</u> case relied upon by the defendants, "a shipowner that has incurred liability in its vessel capacity by the negligent acts of its vessel's crew cannot escape any part of that liability by pointing to the failure of its own stevedoring employees to correct the hazard.  A dual-capacity defendant, negligent <u>in its vessel capacity</u>, cannot escape liability under section 905(b) by asserting that it should have removed the hazard in its stevedoring capacity." <u>Gravatt</u>, 226 F.3d at 132 (emphasis in original).[13]

### L.    THE DEFENDANTS' VESSEL NEGLIGENCE IS NOT EXCUSED BY NORTHLAND SERVICES' ALLEGED NEGLIGENCE IN TRAINING ABRUSKA

Northland Services also attempts to fall on its own sword (but only as an employer) by asserting that "as employer, [it] should have, but did not, train, orient and supervise Abruska."  (Mem. p. 28).  Northland Services, however, has not identified (much less presented any evidence of) what specific training allegedly would have prevented the accident.

---

[13] The Ninth Circuit similarly held in <u>Martinez v. Korea Shipping Corp., Ltd.</u>, 903 F.2d 606,  611 (9th Cir. 1990), that the vessel owner "cannot be absolved of liability solely on the basis that [the stevedoring company] did not put guard rails around or a cover over the ladder opening."  <u>See</u> <u>also</u> <u>O'Hara v. Weeks Marine, Inc.</u>, 294 F.3d 55, 66 (2nd Cir. 2002) ("shipowner is not relieved of liability as a matter of law simply because it relied . . . on the stevedore's judgment to proceed with the work in spite of [a dangerous] condition") (quoting <u>Moore v. M.P. Howlett, Inc.</u>, 704 F.3d 39, 42 (2nd Cir. 1983)).

The defendants' argument is deficient on several counts. First, if defendants had presented any evidence on this issue, it simply would have created a disputed issue of material fact given the defendants' own conclusion that the loose lower railing was a "major contributing cause" of Abruska's accident. (Ex. 2, Northland Inspection Report). Second, assuming *arguendo* that the defendants could somehow produce incontrovertible evidence that negligent training was a cause of Abruska's fall, the defendants still would not be entitled to summary judgment. "[I]t is possible for both the stevedore and the vessel owner to be negligent." Martinez v. Korea Shipping Corp., 903 F.2d 606, 611 (9th Cir. 1990). Indeed, the very nature of safety railings contemplate that someone may make a mistake and need the protection of this safety equipment.[14] See Smith v. Eastern Seaboard Pile Driving, Inc., 604 F.2d 789 (2nd Cir. 1979) (defendant liable in vessel capacity for failing to have emergency plan and rescue equipment). There can be, of course, multiple legal causes of an accident. "Proximate cause is causation substantial enough and close enough to the harm to

---

[14] If the hazard could have been avoided by Abruska (and Abruska contends it could not), then the avoidability of the hazard is simply relevant "to whether the hazard was unreasonably dangerous, it is not necessarily determinative." Thomas v. Newton International Enterprises, 42 F.3d 1266, 1271 (9th Cir. 1994). "Any argument that the avoidability of a hazard should be analyzed separately from its dangerousness is simply a disguised assumption of risk or contributory negligence argument. . . . Congress expressly intended to abolish the use of [these defenses] when it designed [the LHWCA] statutory scheme." Id. at 1271 n.5. Furthermore, "customary practice may suggest that a shipowner should know that longshoreworkers frequently confront rather than avoid a type of obvious hazard." Id. at 1271. If Abruska was himself negligent, than the question is simply one of comparative negligence. Scindia at 1621 (quoting S. Rep.No. 92-1125, p. 11 (1972)); O'Hara v. Weeks Marine Inc., 294 F.3d 55, 66 (2nd Cir. 2002) (LHWCA "establishes a comparative rather than a contributory negligence scheme").

be recognized by law, but a given proximate cause need not be, and frequently is not, the

exclusive proximate cause of harm." <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692, 704 (2004).

## IV.    <u>CONCLUSION</u>

Application of the substantive law regarding longshoreworker 905(b) claims

and the legal standards for summary judgment mandates denial of the defendants' motion.

"Summary judgment is rarely granted in negligence cases.  Whether the defendant acted

reasonably is ordinarily a question of fact." <u>Martinez v. Korea Shipping Corp.</u>, 903 F.2d 606,

609 (9th Cir. 1990) (reversing grant of summary judgment to vessel owner on

longshoreman's 905(b) and remanding for trial).  There is a question of fact whether the

defendants breached their duty to turnover a reasonably safe vessel and whether the

defendants' breach was a proximate cause of Abruska's injuries.

DATED this 22nd day of May, 2006.

ATKINSON, CONWAY & GAGNON
Attorneys for Joseph Abruska

By_____s/ Neil T. O'Donnell_____
    Neil T. O'Donnell
    420 L Street, Suite 500
    Anchorage, AK 99501
    Phone:  (907) 276-1700
    Fax:  (907) 272-2082
    E-mail:  nto@acglaw.com
    ABA No. 8306049

ATKINSON, CONWAY & GAGNON
Attorneys for Joseph Abruska


By_____s/ Christopher J. Slottee_____
        Christopher J. Slottee
        420 L Street, Suite 500
        Anchorage, AK 99501
        Phone:  (907) 276-1700
        Fax:  (907) 272-2082
        E-mail:  cjs@acglaw.com
        ABA No. 0211055


I certify that on May 22, 2006, a copy
a copy of the foregoing was served electronically
on the following attorneys or parties of record:


Thomas G. Waller, Esq.


By  ____s/ Christopher J. Slottee_____
        Christopher J. Slottee