Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF ALASKA AT ANCHORAGE
 3
                                    )
 4   JOSEPH ABRUSKA,                )
                                    )
 5              Plaintiff,          )
                                    )
 6        vs.                       )
                                    )
 7   NORTHLAND VESSEL LEASING       )
     COMPANY, LLC and NAKNEK        )
 8   BARGE, LLC,                    )
                                    )
 9              Defendants.         )
                                    )
10   Case No. A04-209 cv (JKS)
11
12
     VIDEOTAPED DEPOSITION OF CHRISTOPHER J. MANION, M.D.
13
14
               Pages 1 - 56, inclusive
15
              Thursday, March 2, 2006
16                   9:32 A.M.
17
          Taken by Counsel for Plaintiff
18                   at the
          ALASKA NATIVE MEDICAL CENTER
19   4315 Diplomacy Drive, Conference Room 1
                Anchorage, Alaska
20
21
22
23
24
25
```

Page 2

1                    A-P-P-E-A-R-A-N-C-E-S

2

     For Plaintiff:
3
         Christopher J. Slottee
4        ATKINSON, CONWAY & GAGNON
         420 L Street, Suite 500
5        Anchorage, Alaska  99501
         907/276-1700
6

7
     For Defendants:
8
         Thomas G. Waller
9        BAUER MOYNIHAN & JOHNSON
         2101 4th Avenue, 24th Floor
10       Seattle, Washington  98121
         206/443-3400
11

12
     Videographer:
13
         Martha Enslow
14       MEDIA IMPRESSIONS

15
     Court Reporter:
16
         Gary Brooking, RPR
17       PACIFIC RIM REPORTING
         711 M Street, Suite 4
18       Anchorage, Alaska 99501

19

20

21

22

23

24

25

Page 3

1                           I-N-D-E-X

2    EXAMINATION BY                                           PAGE
3        Mr. Slottee                                             5
4        Mr. Waller                                             40
5        Mr. Slottee                                            54
6
7    EXHIBITS
8        1    Dr. Manion Progress Notes and Dictated             4
              Reports (172 pages)
9
10       2    Collection of X-rays (103 pages)                   4
11       3    Intramedullary Rod for the Femur                   4
              (Retained by Mr. Slottee)
12
13       4    Copy of Photo                                     22
14       5    Clinic Note, October 17, 2005,                    45
              ABRUSKA 1000850 AND 1000851
15
16       6    Letter dated August 3, 2004 to Chris              48
              Manion, MD from Steve Wiper (2 pages)
17
18       7    Letter dated June 29, 2004 to Steve Wiper,        50
              SeaBright Insurance Company, from John
19            Swanson, M.D., Impartial Medical
              Opinions, Inc. (12 pages)
20
21       8    Clinic Note, March 23, 2004 (1 page)              53
22
23
24
25

Page 4

1  ANCHORAGE, ALASKA; THURSDAY, MARCH 2, 2006
2  9:32 A.M.
3  -o0o-
4  (Exhibits 1, 2 and 3 marked.)
5  THE VIDEOGRAPHER: My name is Martha Enslow
6  of Media Impressions, P.O. Box 112081, Anchorage,
7  Alaska 99511. I'm the videographer representing
8  Pacific Rim Reporting.
9  It is the 2nd day of March, the year 2006.
10  We're on record at 9:32 a.m. We're at the Alaska
11  Native Medical Center in Anchorage, Alaska, to take
12  the deposition of Dr. Christopher J. Manion, MD, in
13  Case No. A04-209, Joseph Abruska versus Northland
14  Vessel Leasing Corporation (sic), LLC, et al. This
15  deposition is being taken on behalf of the plaintiff.
16  At this time I would like everyone in the
17  room and telephonically to identify themselves
18  verbally.
19  MR. SLOTTEE: Chris Slottee, Counsel for
20  plaintiff, Joseph Abruska.
21  THE REPORTER: Gary Brooking with Pacific Rim
22  Reporting.
23  DR. MANION: I'm Christopher Manion, chief of
24  orthopedics, Alaska Native Medical Center.
25  MR. SLOTTEE: And Tom, could you identify

Page 5

1  yourself?
2  MR. WALLER: Yes. Tom Waller, attorney for
3  defendants.
4  THE VIDEOGRAPHER: Are there any
5  stipulations?
6  MR. SLOTTEE: No.
7  THE VIDEOGRAPHER: Okay. You may swear in
8  the witness.
9  CHRISTOPHER J. MANION, M.D.,
10  deponent herein, being sworn on oath,
11  was examined and testified as follows:
12  MR. SLOTTEE: Thank you.
13  EXAMINATION
14  BY MR. SLOTTEE:
15  Q. Doctor Manion, would you please briefly
16  describe your medical education?
17  A. Yes. I trained at the University of
18  Colorado for medical school, and then did a year of
19  general surgery internship at the University of
20  Colorado and four-year orthopedic surgery residency
21  at the University of Colorado, also.
22  Q. What license and certifications do you
23  hold?
24  A. I'm an M.D. and board certified in
25  orthopedic surgery.

Page 6

1  Q. And what is your current position at Alaska
2  Native Medical Center?
3  A. I'm the service center medical director,
4  which is the chief of orthopedics here.
5  Q. And what I'm going to hand you is marked as
6  Exhibit 1. Does this appear to an collection of
7  Native -- Alaska Native Medical Center records
8  related to Joseph Abruska?
9  A. It appears to be.
10  Q. Okay. And I'm also going to hand you
11  Exhibit 2. And does this appear to be a collection
12  of x-rays relating to Joseph Abruska?
13  A. And it appears to be.
14  Q. Thank you. When did you first see Joseph
15  Abruska?
16  A. August 24th, the year 2003, at
17  approximately 11:30.
18  Q. What did his leg look like at that time?
19  A. I have to refer to my notes, but he was
20  transferred from an injury out in, I believe,
21  Naknek. And at that time, when he presented here,
22  he was in a traction device to his right lower
23  extremity.
24  Q. What does the traction device do?
25  A. It's called a Hare traction, and it's a

Page 7

1  device that helps to realign the lower extremity
2  after a fracture of a -- a long bone, usually the
3  femur.
4  Q. And what was your diagnosis of Joseph when
5  you saw him?
6  A. Plain radiographs, at the time of his
7  presentation to our hospital, demonstrated that he
8  had, on the right side, a pelvis fracture as well as
9  a proximal third femur fracture.
10  Q. Okay. And can you tell us in a summary
11  fashion what you did to treat Joseph's injuries?
12  A. When he was seen in the emergency
13  department, our general surgeons or trauma surgeons
14  evaluated him as well as the orthopedic surgeons, or
15  myself. And once he was cleared, he was taken to
16  the operating room for fixation and stabilization of
17  his femur fracture.
18  Q. And how did you fixate and stabilize his
19  femur fracture?
20  A. With an intramedullary rod.
21  Q. Okay. When you saw Joseph, did his
22  injuries present in an emergency situation?
23  A. Yes.
24  Q. And why were they -- why was it an
25  emergency situation?

Page 8

1  A. Well, he had a crush injury to his pelvis
2  as well as his right large extremity, and had an
3  obvious deformity at the scene. And a femur
4  fracture is an emergency situation.
5  Q. And his injuries required immediate care?
6  A. Correct.
7  Q. Could you please explain where Joseph's
8  femur was fractured?
9  A. I have to look at the x-rays.
10 Q. I think x-ray -- if you look at page 101,
11 that might be a good example of...
12 A. Yeah. Page 101 is the post-operative
13 radiograph which demonstrated a fracture of the
14 proximal third of his femur, so we divide fractures
15 of the femur based on its anatomical location.
16 Q. And so where would the proximal third be?
17 A. The proximal third -- we divide the shaft
18 of the femur into the areas, and we divide them into
19 thirds based on its location. So the proximal third
20 is between the mid-portion of the femur and what's
21 called the lesser trochanter.
22 Q. Could you circle on that x-ray, with this
23 red pen, where the fracture was?
24 A. (Complies.)
25 Q. I think it will be better with a red pen.

Page 9

1  A. There you go.
2  Q. Great. Thank you. Is the femur one of the
3  strongest bones in the body?
4  A. It's one of the bigger bones in the body,
5  and therefore relates some strength to it, yes.
6  Q. And can a femur fracture be
7  life-threatening?
8  A. Yes, they can. It's unlikely in today's
9  world, but in years past, 50 to 100 years ago,
10 people used to die from femur fractures. It's
11 relatively uncommon at this point.
12 Q. What are the complications that can arise
13 from a femur fracture?
14    MR. WALLER: Objection. Form.
15 BY MR. SLOTTEE:
16 Q. Go ahead.
17 A. Complications from femur fractures,
18 injuries to the soft tissues, muscles, tendons,
19 ligaments, bones, damage to arteries or nerves.
20 Q. Was Joseph Abruska in pain when you first
21 saw him?
22 A. I didn't document how much pain he was in,
23 but he was complaining of leg pain at that point.
24 Q. And did -- did Joseph Abruska receive pain
25 medication when he arrived?

Page 10

1  If you could refer to Exhibit 1, pages 146 to
2  151, I believe that's a listing of the medications
3  that Joseph received while in the hospital. And you
4  can confirm that.
5    MR. WALLER: I'll object. It's foundation
6  and hearsay, unless it was Dr. Manion that issued
7  those medications.
8    THE WITNESS: Yeah. It wouldn't have been me
9  that prescribed the medications. In the emergency
10 department, that's either handled by the emergency
11 physicians or the general trauma surgeons.
12 BY MR. SLOTTEE:
13 Q. Okay. But does -- do pages 146 to 151, do
14 they appear to be records from the Native Medical
15 Center about medications that Joseph received while
16 in the hospital?
17 A. That's correct.
18 Q. And if you look on page 149, on the upper
19 right there's a reference to a morphine sulfate IV.
20 A. Uh-huh.
21 Q. What would that be?
22 A. This is for a patient-controlled analgesic,
23 and so that's a PCA pump for pain medication.
24 Q. Okay. And then below that, on the left, it
25 says morphine sulfate ING (sic). Is that a morphine

Page 11

1  sulfate injection?
2  A. Uh-huh.
3  Q. And does that indicate that Joseph received
4  a morphine injection on twelve oh --
5  A. It says it was ordered, and it does not
6  state whether or not it was given.
7  Q. Okay. Could you please describe the
8  intramedullary nailing process?
9  A. The process of nailing or fixating a femur
10 fracture utilizing an intramedullary device, there's
11 numerous ways to do it. In this particular case, we
12 use a radiolucent flat table and raise the lower
13 extremity by putting a bump under the -- the gluteus
14 region. And then your starting point's about four
15 centimeters or a hand width above the level of the
16 greater trochanter.
17    And you make a small incision there, split
18 the gluteal fascia and you place a wire at what's
19 called the piriformis fossa, which is an anatomical
20 landmark on the proximal femur. And then you insert
21 the guide wire down the shaft of the femur and verify
22 this under fluoroscopy to verify that you have it in a
23 correct position.
24    Then you open up the femoral canal, utilizing
25 a drill bit, and subsequently pass a guide wire across

5 (Pages 8 to 11)

Page 12

1  the fracture down to the lower part of the leg, and
2  then sequentially ream that up to a size to where you
3  can put the rod in. And then once the rod's in, we
4  use interlocking bolts to stabilize the -- the rod
5  within the canal of the femur.
6      Q. Okay. And could you look at what has been
7  marked as Exhibit 3.
8      A. Uh-huh.
9      Q. And do you recognize what that is?
10     A. Yes. This is an intramedullary rod --
11 appears -- for the femur.
12     Q. Okay. And do you recognize the writing at
13 the end of the nail on the -- on that side? Does
14 that indicate the size of the nail?
15     A. Correct.
16     Q. And what size does it say that that nail
17 is?
18     A. It's 13 millimeters by 38 centimeters.
19     Q. Okay. How big of a nail did you insert
20 into Joseph?
21     A. I would have to look at my operative
22 report.
23     Q. Look at page 78 on that -- in that exhibit.
24     A. And it was a 12 by 38 centimeter rod.
25     Q. Okay. So this rod that's been marked as

Page 13

1  Exhibit 3 is relatively similar, except for it's
2  slightly smaller in length and diameter than the rod
3  that was inserted in Joseph?
4      A. Slightly smaller in diameter. I believe
5  it's the same length.
6      Q. And how many screws did you use to affix
7  the nail and to place inside Joseph -- inside of
8  Joseph?
9      A. Based on the radiographs on page 101, there
10 was two proximal and one distal.
11     Q. And do you know how long those screws were?
12     A. What page was that? Seventy-eight?
13     Q. Seventy-eight.
14        MR. SLOTTEE: I'm sorry. Sorry, Tom. It's
15 Abruska 90 -- I forgot -- is the Bates number.
16        THE WITNESS: So there was a 5.5 by 75
17 millimeter screw, and there was a 5.5 by 55 and a 5.5
18 by 75, so two 75 millimeters and one 55 millimeter.
19 BY MR. SLOTTEE:
20     Q. And the -- the record that you're looking
21 at is -- is an operative -- or an operation report
22 or a --
23     A. Yeah. This is an intra-operative report.
24     Q. Okay. And reflects what was installed and
25 what was done during the surgery?

Page 14

1      A. Exactly.
2      Q. Okay. Now, if you -- if I can direct you
3  to look at Exhibit 2, which is the x-rays, pages
4  three through nine.
5      A. Uh-huh.
6      Q. Do those reflect the insertion of the nail
7  and the screws?
8      A. Yeah. These are intra-operative
9  radiographs which utilize fluoroscopy, which is an
10 x-ray device to be able to place the -- the rod and
11 the subsequent screws.
12     Q. And the previous x-ray that you -- you
13 looked at that was marked as page 101, which you
14 circled the fracture in red, does that reflect the
15 final position of the nail and screws?
16     A. Yes. I believe this was approximately two
17 months post-operatively, but yes.
18     Q. Do you know how long the surgery, the
19 initial surgery took?
20     A. Operation began 8/24/2003 at 13:06; and
21 operation end time, August 24, 2003, 15:09.
22     Q. And you're looking at the intra-operative
23 report that you referred to earlier?
24     A. Correct.
25        MR. SLOTTEE: Okay. And that's Abruska 89,

Page 15

1  Tom.
2      Q. And was Joseph placed under general
3  anesthesia for this surgery?
4      A. Yes, he was.
5      Q. What risks do you warn your patients about
6  when they undertake this type of surgery?
7      A. From a surgical standpoint?
8      Q. Yes.
9      A. The biggest risks are pain after surgery;
10 bleeding, bleeding to the point that you may require
11 a transfusion. Infection is always something we're
12 worried about, so they receive antibiotics. Damage
13 to nerves and vessels; non-union, whereas the bone
14 doesn't heal; a mal-union meaning the bone heals in
15 a wrong -- bad position; and need for hardware
16 removal, the most common; and post-operative
17 continued pain.
18     Q. And was the surgery a success?
19     A. Yes.
20     Q. Now, how long did Joseph stay in the
21 hospital after his first surgery?
22     A. Do you guys have the discharge summary?
23     Q. I do. I believe it's on Exhibit 1, page
24 eight, which is Abruska 43. I believe that would be
25 the reference to it.

Page 24

1  inside of Joseph's femur?
2  A.  Yeah.  We opened up the internal portion of
3  the femur to 13 millimeters.
4  Q.  Now I would like to go back and discuss
5  Joseph's pelvis fractures.  Can you describe what
6  type of pelvis fractures Joseph suffered?
7  A.  Are these the only films of his pelvis that
8  you have, Exhibit 2, page one and two?
9  Q.  No.  I believe if you look at Exhibit 2,
10 page 97, it might be a better -- and there's also
11 the MRI.  I don't know if that would -- but I also
12 have the radiology reports, if that would be
13 helpful.
14 A.  Yeah.  These films are difficult to read,
15 based on the copying.
16 Q.  Okay.  Well, could you look at Exhibit 1,
17 page eighty- -- page 82 -- actually, page 83.
18 A.  Okay.
19 Q.  It's Abruska 96.  And there is a heading
20 called "Findings."
21 A.  Uh-huh.
22 Q.  And could you read what that says?
23 A.  Yeah.  "Findings:  Displaced midshaft femur
24 fracture on the right, right superior and inferior
25 ramus fracture, left superior and inferior ramus

Page 25

1  fracture, and left sacral fracture."
2  Q.  Does that accurately describe the pelvis
3  fractures that Joseph suffered?
4  A.  As best as I can recollect.
5  Q.  Now, if -- can you mark on the exhibit or
6  the x-rays where the pelvic fractures are, or is
7  that x-ray not helpful enough to do it?
8  A.  Yeah.  This x-ray -- the clarity of the
9  x-ray makes it difficult to accurately circle the --
10 the finding.
11 Q.  Okay.  And I guess if you had a -- just a
12 regular picture of the pelvis, but that wouldn't
13 help at all either?
14 A.  Not without better quality radiographs to
15 actually tell you anatomically where they were
16 broken.
17 Q.  Okay.  Are -- is there typically pain
18 associated with fractures of this type?
19 A.  Of the pelvis?
20 Q.  Uh-huh.
21 A.  Yes.
22 Q.  And did Joseph -- Joseph's pelvic fractures
23 heal?
24 A.  Yes.
25    THE VIDEOGRAPHER:  Pardon me.  Your

Page 26

1  microphone fell off.  Thank you.
2  BY MR. SLOTTEE:
3  Q.  Did you refer Joseph to a urologist after
4  his surgery?
5  A.  That I do not recall.
6  Q.  Okay.  If I can refer you to -- actually
7  two places.  The first one would be Exhibit 1,
8  page 18, which is Abruska 7.
9  A.  Uh-huh.
10 Q.  Can you describe what this document appears
11 to be?
12 A.  This is -- appears to be a telephone
13 message for Joseph Abruska.
14 Q.  Okay.  And does it say, quote:  Phone call
15 from Debbie Credit of workman's comp, (Case Manager)
16 to request -- and under two it says, urology
17 consult, having sexual dysfunction and -- I actually
18 cannot read that last word.
19 A.  That appears to be dysuria.
20 Q.  Dysuria?
21 A.  Yes.
22 Q.  And then it says, okay for both referrals,
23 AFOC; and two, urology per Dr. Manion?
24 A.  Yes.
25 Q.  Does that refresh your recollection at all?

Page 27

1  A.  I did not sign off on this, but this is
2  from my case manager so --
3  Q.  So that would indicate that you would have
4  approved that urology consult?
5  A.  I authorized it, uh-huh.
6  Q.  And also if I can refer you to Exhibit 1,
7  page 56.  And do these appear to be the progress
8  notes or the nursing notes for Joseph Abruska?
9  A.  Yes.  Progress notes.
10 Q.  Okay.  And then on -- that's Abruska 76,
11 Tom.
12    And on the lower part of the page, there's a
13 number one, where it says one, "Urology Consult."
14 A.  Uh-huh.
15 Q.  And then there's your signature on the
16 bottom right?
17 A.  Correct.
18 Q.  Does that refresh your recollection about
19 having a urology consult while Joseph was in the
20 hospital?
21 A.  At least it was ordered, correct.
22 Q.  Okay.  Now, what is -- if -- what is
23 internal rotation of the hip?
24 A.  It's the degree or the movement of the hip
25 as it rotates internally or towards the midline.

Page 28

1  Q. And what would be external rotation of the
2  hip?
3  A. Just the opposite. The hip rotating away
4  from your body.
5  Q. What would be the significance of a reduced
6  hip rotation?
7  A. It depends.
8  Q. Okay. What would it depend on? The --
9  A. Depends on the amount of reduced rotation
10 and -- and what the activity levels are.
11 Q. Now, Dr. Swanson conducted an independent
12 medical exam of Joseph and found that his -- the
13 external rotation of his right hip as opposed to his
14 left hip was 35 degrees versus 50 degrees. Is that
15 a significant reduction in the external rotation of
16 the hip?
17 A. It's 15 degrees, whether or not that's
18 significant or not, just depending on the patient.
19 Q. Okay. And what would make it significant
20 for one patient as opposed to another?
21 A. If it interferes with their activities or
22 their functional level.
23 Q. And could injuries that Joseph suffered in
24 this case result in a reduction of the hip rotation?
25 A. Theoretically.

Page 29

1  Q. What would be the future consequences of a
2  reduced hip -- hip rotation?
3      MR. WALLER: Objection. Form.
4      THE WITNESS: It depends on the severity of
5  it. The 15 degrees, it should not be a functional
6  deficit for this patient long term.
7  BY MR. SLOTTEE:
8  Q. Did you remove the screws from Joseph's
9  right leg in January of 2006?
10 A. I believe so.
11 Q. Were you also contemplating removing the
12 nail from Joseph's leg at the same time?
13 A. Correct.
14 Q. What was the reasons for removing or
15 attempting to remove the nail and screws?
16 A. To remove the screws. He was having knee
17 pain as -- and it was thought that this may be
18 associated with the screw irritating the soft
19 tissues about his knee. And he still had some pain
20 on the lateral aspect of his hip where the screws
21 were, so it was felt that removing those screws were
22 warranted, and that the patient desired to have the
23 rod removed also.
24 Q. So is it common to have continued leg pain
25 after intramedullar- -- intramedullary nailing?

Page 30

1  A. It's one of the known complications.
2  Q. And is the knee pain a known complication
3  of intramedullary -- -medullary nailing?
4  A. Correct.
5  Q. Now, in the records there was reference to
6  you saying that even if the hardware was removed,
7  Joseph might still have pain in his leg?
8  A. Correct.
9  Q. Do you remember that?
10 A. Correct.
11 Q. Why would that -- why would he still have
12 pain?
13 A. Because not only was his femur broken, he
14 also sustained damage to the surrounding soft
15 tissues, the muscles surrounding his leg.
16 Q. Can -- if that pain is caused by the damage
17 to the surrounding soft tissue and muscles, is there
18 any medical procedure or medication that can be used
19 to treat that pain?
20 A. It depends on the severity of it, but
21 there's medication. There's no surgical procedure
22 that can be done to alleviate that discomfort.
23 Q. And could you please describe the surgery
24 to remove the screws and nail from Joseph's leg?
25 A. Yeah. We utilized the same incisions

Page 31

1  that he had had for the placement of those screws,
2  and just dissect down to where those screws are,
3  free the screw heads up from any surrounding scar
4  tissue and remove the screws just with a
5  screwdriver.
6  Q. Were you able to remove the nail from
7  Joseph's leg?
8  A. No, I did not.
9  Q. And why not?
10 A. It had overgrown. It was a well-seated --
11 the nail was right at the level of where his bone
12 was, and he had a slight amount of -- what's called
13 heterotopic ossification, which was over the top of
14 the rod. And I elected not to extend my surgical
15 incision and soft-tissue stripping to -- to remove
16 the rod.
17 Q. So to remove the rod, you would have -- you
18 would have had to cut away more of his -- the flesh
19 or the muscles?
20 A. Yeah. It would have been a larger skin
21 incision, bigger soft tissue dissection through the
22 muscles and then removing some of the muscle that
23 was encased with the bone and then taking the rest
24 of the bone off of where the rod was.
25 Q. And how does heterotopic ossification

Page 32

1  occur?
2  A. We're unsure exactly as the etiology of it,
3  but it appears to be damage to the muscle that
4  occurs either with the injury or with the surgical
5  procedure that then causes blood to form in there.
6  And then that blood and the damage to the soft
7  tissues gets calcified and basically turns into
8  bone.
9  Q. Will Joseph ever be able to have the nail
10 removed from his leg?
11 A. If it -- he could, in theory, have it
12 removed.
13 Q. Would you recommend that he have it
14 removed?
15 A. No.
16 Q. And why not?
17 A. I -- I don't think that it's the rod that's
18 contributing to his discomfort in his leg, and it's
19 a bigger and more morbid procedure to go in and
20 remove it.
21 Q. What do you think is causing the discomfort
22 and the pain in his leg?
23 A. Currently his pain's related to his knee,
24 and I'm unsure as to the exact etiology of his pain
25 at this point. It's still being managed.

Page 33

1  Q. Did you prescribe Joseph any pain
2  medication after his second surgery?
3  A. I believe I would have, but I would need to
4  look at my records.
5  Q. Okay. I refer you to page 95 of Exhibit 1,
6  which is a Abruska 901.
7  A. Uh-huh.
8  Q. Is there a reference there to Percocet?
9  A. Correct.
10 Q. So you -- you would have provide- --
11 prescribed him Percocet after the surgery?
12 A. Correct.
13 Q. And it is common to have pain after a
14 surgery of this type?
15 A. Yeah. It's still -- cutting the skin and
16 dissecting down to the bone, so it's -- yes, it is
17 common.
18 Q. Now, you recently saw Joseph. Is that
19 right?
20 A. Correct.
21 Q. You saw him on Monday?
22 A. I believe so.
23 Q. And have you determined another possible
24 cause of the -- Joseph's knee pain aside from the
25 screws?

Page 34

1  A. Yeah. He still continues to have some
2  discomfort related to his knee, and it appears to be
3  inside his knee. So he may have something going on
4  inside the knee joint itself.
5  Q. Could be like a torn meniscus or other
6  ligament damage?
7  A. Or scar tissue or a number of different
8  things, correct.
9  Q. And would that be a result of the injury,
10 the original injuries he suffered in August of 2003?
11 A. It would be not unheard of for associated
12 knee injury with this type of injury.
13 Q. Now, do you know what the possible side
14 effects are of taking pain medication such as
15 Percocet or Vicodin over the course of several
16 years?
17 A. I'd leave that up to the pharmacist to tell
18 you exactly.
19 Q. If Joseph's right leg continues to hurt,
20 and he favors it when he's walking, will that have
21 any future effect on his hip, knee or gait over
22 time?
23 A. It would affect his gait, just because he
24 would be limping.
25    Would it affect his hip? Probably not. His

Page 35

1  knee is what continues to bother him now, and we're
2  still trying to figure out exactly why he's still
3  having knee pain.
4  Q. In regards to Joseph Abruska, did you
5  ever -- do you know who Dr. John Swanson is?
6  A. I'm not familiar with that doctor.
7     MR. SLOTTEE: Okay. If we can go off record
8  for just a minute. I want to just go --
9     THE VIDEOGRAPHER: Off record, 10:06 a.m.
10    (Off record.)
11    THE VIDEOGRAPHER: On record, 10:08 a.m.
12 BY MR. SLOTTEE:
13 Q. In regards to the -- the nailing process
14 and -- and actually inserting the nail in the first
15 place, how much force is required to ream out the
16 inside of a femur?
17 A. It's done manually, so I don't know how
18 many pounds of pressure it takes.
19 Q. And when you insert the nail, is it -- do
20 you have to -- you said before that it was
21 inserted -- it was placed on a guide wire and then
22 guided into place. Is it a smooth fit, or is it --
23 do you have to force it in or --
24 A. No. It's a -- it's a tight fit, and it's
25 placed in with utilizing a hammer.

11 (Pages 32 to 35)

Page 44

1  Q. And how do you decide what other times to
2  give pain medication?
3  A. Oh, specifically for pain medication? It's
4  based on patient symptomology and what their
5  expectations are.
6  Q. For somebody like Mr. Abruska, say, six
7  months or a year after the surgery, what decisions
8  would go into your mind if the request had been made
9  whether or not to give pain medication?
10 A. Yeah. It's six months or a year out of
11 surgery. Usually we leave -- leave pain medication,
12 especially narcotics, up to their primary care
13 provider, the person who sees them on a regular
14 basis. After the acute injury and their surgery,
15 and an expected time to heal, then I defer that to
16 their regular physician.
17 Q. Fair enough. Do you have any knowledge of
18 his work history after your first surgery?
19 A. I don't.
20 Q. If you could turn to the -- there's about
21 15 or 20 pages of documents that I had faxed up
22 there. Do you have that there today, Doctor?
23 A. They were just handed to me.
24 Q. Okay. Can you identify the top two pages
25 of those documents?

Page 45

1  A. The top two that were just handed to me is
2  a clinic note dated 10/17, year 2005.
3  Q. Okay. And then on the second page of that,
4  that's just -- is your electronic signature?
5  A. Correct.
6     MR. WALLER: Okay. I would like to identify
7  that as the next exhibit, Court Reporter, if I could,
8  please.
9     (Exhibit 5 marked.)
10    THE REPORTER: Okay. That's Exhibit 5.
11 BY MR. WALLER:
12 Q. Okay. Exhibit 5, Dr. Manion, for
13 clarification, is your chart note of October 17th,
14 2005?
15 A. Correct.
16 Q. Is that -- is that correct?
17 A. Correct.
18 Q. Okay. On the physical examination portion
19 of this clinic note of October 17th, Exhibit 5, did
20 you find any objective evidence of -- of limitation
21 or pain with Mr. Abruska?
22 A. Limitation of range of motion, hip flexion,
23 was to 95 degrees, which is slightly less than I
24 would expect in a young gentleman. And then he had
25 some pain over his side of his hip.

Page 46

1  Q. And that's where the proximal screws were
2  there that were still in his leg?
3  A. Correct. At that point, his screws would
4  have still been in his leg, correct.
5  Q. Okay. And there's men- -- he did not
6  mention any pain in his pelvis, if I'm reading this
7  accurately?
8  A. On physical exam, I could not elicit any
9  pain.
10 Q. Okay. By the way, on your recent surgery,
11 Doctor, when do you expect to be able to tell
12 whether those -- that screw removal or the hardware
13 removal was alleviating any of Mr. Abruska's pain?
14 Would you be able to expect to tell that already, or
15 do you need some time to evaluate that?
16 A. You usually need a little bit of time. The
17 soft tissues usually take anywhere from four to six
18 weeks to heal.
19 Q. Okay. Do you have another appointment to
20 see him, do you know?
21 A. Yeah. After he has the MRI of his knee, I
22 will see him back.
23 Q. Okay. In your plan there on your chart
24 note of October 17th, can you determine there
25 whether you prescribed him any med- -- pain

Page 47

1  medication?
2  A. It does not appear that I prescribed him
3  any pain medication, based on this note.
4  Q. Do you have -- are you aware of whether you
5  did or not prescribe him any pain medication back in
6  October?
7  A. Not sure with what -- what I have in front
8  of me.
9  Q. Okay. Is it -- just to be fair to you, is
10 this something that you usually put that in this
11 clinic note, or is that something you wouldn't
12 usually put in here if you gave him a medication?
13 A. No. Usually, if you represcribe something,
14 it's in the dictated note.
15 Q. Okay.
16 A. Or -- or written on the handwritten note in
17 the clinic.
18 Q. Fair enough. If you would turn to the next
19 two pages that I hope are in front of you, which
20 is -- and -- and identify what that is, if you
21 could, please.
22 A. After those first two?
23 Q. Yes.
24 A. Is the SeaBright Insurance Company dated
25 August 3, 2004.