NEIL T. O'DONNELL
CHRISTOPHER J. SLOTTEE
ATKINSON, CONWAY & GAGNON
Attorneys for Plaintiff Joseph Abruska
420 L Street, Suite 500
Anchorage, Alaska 99501-1989
Phone: (907) 276-1700
Fax: (907) 272-2082
nto@acglaw.com
cjs@acglaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOSEPH ABRUSKA, | Case No. 3:04-cv-209-TMB |
| Plaintiff, | |
| vs. | |
| NORTHLAND VESSEL LEASING COMPANY, LLC, et al., | |
| Defendants. | |

### PLAINTIFF'S DISCLOSURE OF EXPERT REPORT

Plaintiff Joseph Abuska hereby produces the attached January 25, 2008, Report of expert Richard Roth.

DATED this 21 day of February, 2008.

ATKINSON, CONWAY & GAGNON
Attorneys for Joseph Abruska

By _____
Neil T. O'Donnell
ABA #8306049

LAW OFFICES
ATKINSON, CONWAY
& GAGNON, INC.
420 L STREET
SUITE 500
ANCHORAGE,
ALASKA 99501
TEL: (907) 276-1700
FAX: (907) 272-2082

Exhibit A
Page 1 of 8 Pages

I certify that on February 21, 2008, a copy
of the foregoing document was sent
to the following attorneys or parties
of record by:

( ✓ ) Mail
( ) Facsimile
( ) Hand Delivery

Jay E. Bitseff, Esq.
Thomas G. Waller
Bauer Moynihan & Johnson LLP
2101 Fourth Avenue, Suite 2400
Seattle, WA 98121

_____
Neil T. O'Donnell

LAW OFFICES
ATKINSON, CONWAY
& GAGNON, INC.
420 L STREET
SUITE 500
ANCHORAGE,
ALASKA 99501
TEL: (907) 276-1700
FAX: (907) 272-2082

PLAINTIFF'S DISCLOSURE OF EXPERT REPORT
Abruska v. Northland Leasing Company, LLC – Case No. 3:04-cv-209-TMB
Page 2 of 2
94303/7407.1

Exhibit 1
Page 2 of 8 Pages

RICHARD W. ROTH
PO BOX 1144
ANACORTES, WA 98221

360-299-8171
360-770-1083 (cell)
richardwroth@msn.com

January 25, 2008

Neil T. O'Donnell, Esq.
Atkinson, Conway & Gagnon
420 L St., Suite 500
Anchorage, AK 99501

Subject: Joseph Abruska Injury Aboard the Barge *Baranof Trader*

Dear Mr. O'Donnell:

    You have asked me to review a number of documents regarding the injury of Joseph Abruska aboard the barge *Baranof Trader* in Naknek, Alaska, on August 23, 2003. In reviewing these documents, I have relied on my experience in barge cargo operations based on over 35 years of work in the marine industry. Among other things, my work has included performing and supervising longshore work aboard barges. I have not testified at trial or by deposition within the last five years.

    As you requested, I have reviewed the following documents:

1. Portions of Abruska's and Northland's appellate briefs describing the accident;

2. Deposition of Joseph Abruska with exhibits;

3. Deposition of William Emory with exhibits;

4. Deposition of Luke Donkersloot with exhibits;

5. Deposition of Leo Naekel with exhibits;

6. Joseph Abruska's May 19, 2006, Affidavit;

7. Plaintiff's Supplemental Material Regarding Lower Safety Railing Height dated October 3, 2006;

Exhibit 1
Page 3 of 8 Pages

Neil T. O'Donnell, Esq.
January 25, 2008
Page 2 of 4

8. CD containing Northland Investigation Photos; and

9. CD containing photographs of the barge *Baranof Trader* in Seattle taken by Rhonda Gerharz on September 14, 2005.

Based on my review of the listed documents and photographs I offer the following observations of events leading up to the accident:

### 1. General working conditions aboard the *Baranof Trader* at the time of the accident

Mr. Abruska was working in a limited space between the cargo containers and the deck edge. The work he was assigned, lashing cargo containers, requires the worker to bend over or kneel down to attach the lower shackle to the deck pad-eye, a position which can make it difficult for even a skilled, experienced longshoreman to maintain balance.

### 2. Movement of the barge during the cargo operations

The *Baranof Trader* was secured to a dock in Naknek, Alaska, and cargo containers were being loaded onboard using the pass/pass method, where containers are placed onto support rails extending out from the dock face and an onboard lift truck then lifts and moves the containers to the proper stowage location on the barge. The movement of the lift truck onboard the barge causes the barge to react in a generally opposite direction to the movement of the lift truck. Therefore, when the lift truck backs away from the side of the barge with a loaded container, the barge tends to surge toward the dock and strike the fender piling; and, when the lift truck stops to change direction, the barge tends to surge away from the dock, until it fetches up on the mooring lines. This movement is often swift with abrupt stops when the barge contacts the fender piling or when the mooring lines come tight. The abrupt stops and often rapid change in direction of movement can make walking and working on the barge difficult, sometimes causing even experienced longshoremen to lose balance. Most experienced longshoremen can compensate for the movement by keeping their knees bent slightly while walking and gripping or bracing against a secure object while bending or kneeling. Since the movement of the barge is not consistent in timing or severity, however, workers may find themselves already in a kneeling position with both hands occupied when the barge surges or strikes a fender pile and have no chance to brace against or grip a secure object.

Any movement of the barge toward the dock caused by the lift truck's backing away from the port side would cause the barge to come into contact with the fender pile, which in turn would cause anyone on the barge to be moved to port.

Exhibit 1
Page 4 of 8 Pages

Many of the longshoremen who are walking or standing will automatically brace themselves and may never actually realize that the movement has occurred. Even an experienced longshoreman who is kneeling or bending at that moment, however, will need to brace against a secure object to keep from losing balance and falling to port.

### 3. Apparent lack of readiness to begin cargo operations onboard the vessel

Prior to a longshore gang's beginning cargo operations onboard a vessel, it is common for the foreman to inspect the vessel and insure that, among other things, the safety railings are in place and adequate. The foreman notes any discrepancies and puts the vessel crew on notice to make the necessary repairs or adjustments. Since an unmanned barge has no crew of its own, it is common for the crew of the towing tug to ready the barge for cargo operations. In ports such as Naknek, however, where the towing tug cannot remain with the barge while it is alongside the dock, the vessel operator may contract with the stevedoring contractor or some other third party to make any needed repairs or adjustments. Regardless of who actually performs the work, the vessel operator is responsible for the condition of the vessel prior to and during the cargo operation.

### 4. Importance of safety rails or wires

It has been long established that a vessel with open access to the deck edge must have adequate safety rails along the deck edge or grab rails along the hatch combings in order to prevent crew members or longshoremen from going overboard. In order to be effective the rails must be multi-course with openings between courses small enough to prevent a person from accidentally passing through and with support stanchions strong enough to resist a reasonable impact load. Safety wires must be kept tight and secure. Wires allowed to slacken can be deceptive because, although they appear to be tight between stanchions, if pressure is applied, the wires tend to resist at first and then begin to give as the slack portion is pulled through the guide pieces on the support stanchions. This phenomenon is normally caused by someone stepping or climbing on a slack safety wire, which pulls the wire tight along its length and deposits all of the excess length between the two closest stanchions. The wire will remain in that position until pressure is applied by climbing on or falling against the wire at a different location.

### 5. Incident Investigation Report

Among the documents provided for my review is one titled "Incident Investigation--Personal Injury to Joseph Abruska." This report describes the

Exhibit 2
Page 5 of 8 Pages

Neil T. O'Donnell, Esq.
January 25, 2008
Page 4 of 4

accident and, on page 5, lists what the report describes as "contributing factors." In this list, under the heading "Safety Lines," the report states [emphasis in original]:

> **Safety Lines**--Inadequate and improperly secured safety lines [reference to photographs omitted] this is considered to be a <u>major contributing factor</u>. Joseph was able to fall through the safety lines due to the lower line being slack.

Based on my review of the listed documents, I have to agree with this report's finding that the slack safety wire allowed Mr. Abruska to pass through and end up overboard.

Based on all of the above, I have formed the following opinions:

1. Even a skilled, experienced longshore worker could have lost balance and fallen against the port side safety wires.

2. The port side lower safety wire was slack enough to allow a person to pass through.

3. The vessel operator was negligent in allowing the safety wire to become slack enough to allow a person to pass through.

Thank you for contacting me about this matter.

Yours truly,

Captain Richard Roth

Exhibit A

Page 6 of 8 Pages

PO Box 1144  
Anacortes, Washington  
98221  

Phone 360 299 8171  
Cell    360 770 1083  
Fax    360 299 2557  
richardwroth@msn.com

# Richard W. Roth

## Professional Qualifications

**Employment summary**

1975 to 2000: Crowley Maritime Corp. Last assignment: Pacific region manager of marine operations (retired the end of 2000).

2001 to present: The Glosten Associates (part time position). Senior marine consultant.

In 1975, began a 25-year career with Crowley Marine Services, Inc., as chief engineer aboard deep-sea tugs, progressing through various positions of increasing responsibility to regional manager, Pacific Coast marine operations. Most recent assignments included participation in the design and implementation of a new generation of 10,000 hp VSP tractor tugs designed for tanker escort and the development of a marine-based oil spill contingency fleet for arctic operations. Retired from Crowley in 2000. In 2001, began part-time marine consulting with The Glosten Associates, Inc. Details below.

**Education**

- Chula Vista High School, Chula Vista, CA (1955-1958)
- Various college-level courses

**Licenses**

- U.S. Coast Guard--Master, Steam & Motor Vessels (Near Coastal), 100 tons. Previously held Master 1600 tons, currently expired, renewable if necessary (first issue 1980)
- U.S. Coast Guard--Chief Engineer, Motor Vessels (Limited Oceans), Any Horsepower (first issue 1967)

**Training**

- 2000 Bridge Resource Management, California Maritime Academy
- 2000 Automated Radar Plotting (ARPA), PNW Maritime Institute
- 1998 Tank Vessel Person-in-Charge, California Maritime Academy
- 1996 Root Cause Accident Investigation, Systems Improvement, Inc.
- 1995 Advanced AFFF Foam Firefighting Methods, Texas A&M
- 1994 Advanced Marine Firefighting, Washington State Fire Academy

| | |
|---|---|
| **Employment Detail** | • 1958 – 1961: U.S. Navy, Honorable discharge. Engineering watch petty officer. Special training included steam plant operation, shipboard firefighting and damage control. |
| | • 1962 – 1975: Various deep-sea shipping companies, engineering watch officer. |
| | • 1975 – 1976: Chief engineer, Crowley Maritime Corporation. |
| | • 1976 - 1979: SATOL (Crowley Maritime Corp.), Damam, Saudi Arabia. Duties included full responsibility for repair and maintenance of marine and land-based equipment.. |
| | • 1979 – 1982: Crowley Marine Services, Caribbean Operations, San Juan, Puerto Rico, marine operations manager. Operational responsibility for a tug and barge fleet engaged in common carrier freight and contract towing trade throughout the Caribbean. . |
| | • 1982 – 1986: Crowley Marine Services, Anchorage, Alaska. Management positions based primarily in the U.S. Arctic region. |
| | • 1986 – 1995: Crowley Marine Services, Anchorage, Alaska. Alaska regional operations manager, with responsibility for all Crowley marine operations in Alaska, including offshore supply vessels in Cook Inlet, tanker assist /escort tugs at the Valdez tanker terminal in Prince William Sound. |
| | • 1976 – 1998: Crowley Marine Services. Designated salvage master or assistant salvage master in several marine salvage and firefighting operations, including projects in Alaska, British Columbia, Jamaica, Puerto Rico, Surinam, Korea, and Saudi Arabia. |
| | • 1995 – 2000: Crowley Marine Services, Seattle, Washington. West Coast regional manager. Responsible for all Crowley marine operations on the U.S. west coast and Pacific Ocean regions. |
| | • 2001 - 2006 The Glosten Associates, Inc., Senior Marine Consultant. (part time project basis). Participate in planning and execution of large offshore drilling platform tows and delivery of heavy oversized cargo to remote oilfield sites . |
| **Woodworking Experience** | Primarily self-taught precision woodworker with interest in cabinetmaking and small boat building and repair. |

Richard W. Roth
Updated September 2007
Page 2 of 2

Exhibit 2
Page 8 of 8 Pages